**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Criminal Action No. 20-cr-00148-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL SANG CORREA,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT**

---

This matter is before the Court on Defendant Michael Sang Correa's Motion to Dismiss the Indictment Pursuant to the Fifth Amendment Due Process Clause, and Motion to Dismiss the Indictment: The Torture Act is Unconstitutional. (Docs. # 98–99.) For the following reasons, the Motions are denied.

## I.    <u>BACKGROUND</u>

Except where noted, the following facts have been agreed to by the parties. Mr. Correa is a citizen and national of The Gambia, a small country in northwest Africa. (Doc. # 98 at 1; Doc. # 101 at 1.) In 1994, the long-standing democratic government of The Gambia was toppled in a military coup d'état led by a lieutenant in The Gambian Armed Forces named Yahya Jammeh. (Doc. # 98 at 2; Doc. # 101 at 2.) Jammeh ruled The Gambia for the next 22 years. (Doc. # 98 at 2; Doc. # 101 at 2.) Jammeh was

defeated in a presidential election in 2016 by the current president of The Gambia, Adama Barrow. (Doc. # 98 at 2; Doc. # 101 at 2.)

The allegations at issue in the indictment against Mr. Correa stem from events following a March 2006 coup plot against the Jammeh regime. (Doc. # 98 at 3; Doc. # 101 at 2.) Members of Jammeh's military and intelligence, including allegedly Mr. Correa, arrested, detained, and investigated individuals suspected of plotting the coup. (Doc. # 98 at 3; Doc. # 101 at 2.) During these investigations it is alleged that Mr. Correa and others engaged in severe mental and physical abuse for the purpose of extracting confessions to be used in subsequent prosecutions of the coup plotters in The Gambia. (Doc. # 98 at 3; Doc. # 101 at 2–3.) The Government avers that one of the alleged victims of this torture was a dual citizen of The Gambia and the United States at the time. (Doc. # 101 at 1, 3.)

The Government alleges that on December 16, 2016—following Jammeh's electoral loss to President Barrow—Mr. Correa traveled to the United States on a G-2 visa which he had previously acquired as a representative of a recognized government to attend the September 2017 meetings of the United Nations General Assembly. (*Id.* at 3.) According to the Government, Mr. Correa then purposefully overstayed his visa and remained in the United States unlawfully. (*Id.* at 3–4.) The Government asserts that Mr. Correa was administratively detained by Homeland Security Investigations on September 17, 2019, in Colorado. (*Id.* at 3, 22.) As stated by the Government, Mr. Correa then availed himself of U.S. Immigration proceedings in an attempt to remain in this country. (*Id.* at 3.)

On June 2, 2020, Mr. Correa was charged by indictment with one count of conspiracy to commit torture, and six counts—one for each of six alleged victims—of torture, in violation of 18 U.S.C. §§ 2 and 2340–2340A. (Doc. # 1.) Mr. Correa made his initial appearance and was detained pending trial. (Doc. # 20.) On December 1, 2023,[1] Mr. Correa filed the instant Motions wherein he argues that his indictment should be dismissed because (1) his prosecution pursuant to the criminal laws of the United States violates the Due Process Clause of the United States Constitution (Doc. # 98), and (2) the Torture Act, 18 U.S.C. §§ 2340–2340A, under which he has been charged, is unconstitutional (Doc. # 99). In his Motion regarding the constitutionality of the Torture Act, Mr. Correa acknowledges that his argument is foreclosed by current precedent from the Supreme Court of the United States Court and that he is filing that Motion "for preservation purposes only." (*Id.* at 1.)

Pursuant to the Scheduling Order (Doc. # 94) the Government timely filed its Responses (Docs. ## 100–01) on January 30, 2024. Although not contemplated by the Scheduling Order, on February 6, 2024, Mr. Correa filed an Unopposed Motion for Leave to File a Reply. (Doc. # 102.) The Court granted that Motion the following day, and Mr. Correa timely filed his Reply on February 20, 2024. (Docs. ## 103–04.) After reviewing the parties' briefs, the Court concludes that a hearing would not materially assist in the determination of this Motion, and neither party has requested one.

---

[1] The long gap in this case was due to the need for proceedings pursuant to the Confidential Information Procedures Act. *See* (Docs. ## 40, 65, 69.)

## II.   ANALYSIS

### A.   FIFTH AMENDMENT RIGHT TO DUE PROCESS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."[2] U.S. Const. amend. V. "Where Congress expressly intends for a statute to apply extraterritorially"—as is the case here, 18 U.S.C. § 2340A—"the 'burden is a heavy one' for a defendant seeking to show that extraterritorial application of the statute violates due process." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016) (quoting *United States v. Ali*, 718 F.3d 929, 944 n.7 (D.C. Cir. 2013)). The parties agree that there is no case, persuasive or precedential, which addresses the exact question at issue in this Motion: whether the prosecution of a noncitizen under the Torture Act for crimes committed entirely within the jurisdiction of another sovereign state, comports with the Due Process Clause.[3]

In his Motion to Dismiss pursuant to the Due Process clause of the Fifth Amendment, Mr. Correa presents the case law regarding extraterritorial application of United States criminal laws as a circuit split in which neither the Supreme Court, nor the United States Court of Appeals for the Tenth Circuit, has spoken. (Doc. # 98 at 4.)

---

[2] Because the Fifth Amendment applies to "persons," the Supreme Court has held that its protections extend to noncitizens present in the United States. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[W]e have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government.").

[3] To the extent Mr. Correa's references to the future make up of a jury, compulsory process, or access to evidence and witnesses are an attempt to make procedural due process arguments (Doc. # 98 at 5–6, 14–16, 20–21), the Court declines to consider such arguments at the present time as they are not sufficiently briefed.

According to Mr. Correa's reading, the Second, Fourth, and Ninth Circuits require the dismissal of an indictment against a noncitizen defendant accused of committing crimes outside the United States unless there exists "a sufficient nexus between the defendant and the United States, so that the application of criminal statutes to his conduct would not be arbitrary or fundamentally unfair." (*Id.* at 5 (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2nd Cir. 2011)) (alternations incorporated)); *see also* (*id.* at 6–11.) Mr. Correa argues that, of the approaches employed by the various circuits, the nexus test is the "most attuned to the fundamental right our country has engrained in its legal system through the Fifth Amendment Due Process Clause: 'fair play and substantial justice.'" (*Id.* at 5 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).) Accordingly, Mr. Correa urges this Court to adopt and employ this "nexus test" to find that his indictment should be dismissed as lacking such a sufficient nexus.

However, Mr. Correa's reading of the case law—within these circuits and without—is outdated, overly simplistic, misleading, or all three. It is true that in *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990), the Ninth Circuit concluded that,

> [i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, *see United States v. Peterson*, 812 F.2d 486, 493 (9th Cir. 1987), so that such application would not be arbitrary or fundamentally unfair.

905 F.2d at 248–49. *Davis* concerned the prosecution of a foreign national apprehended in international waters aboard a British ship carrying marijuana. *Id.* at 247. Mr. Davis was prosecuted pursuant to the Maritime Drug Law Enforcement Act ("MDLEA") which prohibits the possession of narcotics on the high seas. The Ninth

Circuit concluded that due process was satisfied in *Davis* because "the facts . . . support the reasonable conclusion that [the defendant] intended to smuggle contraband into United States territory." *Id.* at 249.

It is also true that other circuits, including the Second and the Fourth, relied on *Davis* when they faced questions regarding the extraterritorial application of U.S. criminal law. *See United States v. Brehm*, 691 F.3d 547, 552–54 (4th Cir. 2012) (holding that due process's requirement of "fair warning" that a foreign defendant could face trial in the United States was satisfied where the defendant had signed a "Foreign Service Employment Agreement" providing that he may be subject to U.S. criminal jurisdiction); *United States v. Mohammad-Omar*, 323 F. App'x 259, 261–62 (4th Cir. 2009) (concluding that extraterritorial application of U.S. drug laws did not violate due process where "the facts of the case supported the 'reasonable conclusion that [the defendant] intended to smuggle contraband into United States territory'" creating "ample reason to anticipate being haled into court in the United States") (quoting *Davis*, 905 F.2d at 249); *Al Kassar*, 660 F.3d at 118 (applying the *Davis* nexus test to conclude that due process was satisfied in the prosecution of foreign nationals for conduct occurring entirely outside the United States because the defendants' aim "was to harm U.S. citizens and interests and to threaten the security of the United States."); *United States v. Yousef*, 327 F.3d 56, 111–12 (2d Cir. 2003) (same).

However, although the Second and Fourth Circuits cited to *Davis* in concluding that the prosecution of foreign nationals for extraterritorial crimes comported with due process, there is no indication that the Second and Fourth Circuits intended to hold that

nexus was the only means to do so. Having concluded in *Al Kassar* and *Yousef* that nexus between the criminal acts and the United States clearly existed, the Second Circuit had no reason or occasion to consider whether there may be other means to satisfy due process. *Al Kassar*, 660 F.3d at 118; *Yousef*, 327 F.3d at 111–12; *see also United States v. Shi*, 525 F.3d 709, 723–24 (9th Cir. 2008) (explaining that, although the Second Circuit in *Yousef* relied on *Davis* to conclude a nexus was required, *Yousef* did not consider other Ninth Circuit cases which "suggest that a nexus is not required when the offender's conduct is proscribed universally.").

 The Fourth Circuit is more explicit, stating in a footnote in *Brehm* that, although it "finds the analyses [in *Davis* and *Yousef*] instructive, [it] need not decide . . . whether a showing of sufficient nexus is either adequate or required to satisfy due process in the prosecution of a foreign national in U.S. courts." 691 F.3d at 552 n.7. Further, although the Fourth Circuit discusses nexus in *Brehm*, it appears more concerned with whether a defendant had "fair warning" that "they could be subject to criminal prosecution in the United States" and any potential "inherent unfairness" where no such warning existed. *Id.* at 552–54; *see also United States v. Ayesh*, 702 F.3d 162, 167 (4th Cir. 2012) (holding "the district court's exercise of extraterritorial jurisdiction comported with due process" where the defendant had been "provided with a copy of the Foreign Service National Handbook, which advised him that he was subject to the laws and regulations of the United States."); *Mohammad-Omar*, 323 F. App'x at 262.

 More recently, in a case cited by both the Government and Mr. Correa, *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008), the Ninth Circuit explained that nexus is not

the only means of satisfying the Due Process Clause. Mr. Shi was a Chinese national who murdered Taiwanese and Chinese individuals while working on a Taiwanese fishing vessel, registered in the Republic of the Seychelles, sailing in international waters off the coast of Hawaii. *Id.* at 718. Five days after the murders, the United States Coast Guard intercepted the ship. *Id.* Mr. Shi was eventually arrested for violating a United States criminal law which prohibits acts of violence that endanger maritime navigation. *Id.* at 719. Like Mr. Correa, Mr. Shi argued that his prosecution in the United States violated the Due Process Clause of the Fifth Amendment because there existed no nexus between him or his crimes and the United States. *Id.* at 722.

The Ninth Circuit reviewed *Davis* and its progeny and concluded that its case law left open the door for multiple means of satisfying the Due Process Clause. *Id.* The Ninth Circuit explained that Mr. Davis's prosecution had required a nexus, imposed as a matter of due process, because "some states do not consider [possession of narcotics on the high seas] criminal." *Id.* (citing *Davis*, 905 F.2d at 248–49) (internal quotation marks omitted). On the other hand, *United States v. Caicedo*, 47 F.3d 370 (9th Cir. 1995)—which Mr. Correa relies on extensively in his Reply (Doc. # 104 at 2–3, 5)— found that "due process did not require any such nexus" when foreign defendants are apprehended on stateless vessels, because "[s]uch vessels are international pariahs," which, "by attempting to shrug the yoke of any nation's authority, . . . subject themselves to the jurisdiction of all nations." *Shi*, 525 F.3d at 722 (quoting *Caicedo*, 47 F.3d at 372) (internal quotation marks and citation omitted). From these holdings and application of the "rough guide" of international law, the Ninth Circuit deduced that Constitutional Due

Process is satisfied where the offense is universally condemned, or where the statute under which the defendant is prosecuted was passed to implement an international treaty. *Id.* at 722–24.

The Ninth Circuit also noted that this understanding of due process comports with decisions from the Third Circuit and the D.C. Circuit. *Id.* at 723–24 (citing *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (holding that inasmuch as a crime is "condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment" of offenders); *United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998) (concluding federal jurisdiction was proper where the statute of conviction was enacted to implement an international agreement to prosecute perpetrators of widely-condemned conduct)).

Mr. Correa argues extensively in his Reply that *Shi* does not stand for the proposition that universal condemnation of a crime is an alternate means of satisfying due process. (Doc. # 104 at 1–3.) Rather, Mr. Correa argues that *Shi* only excepts from the nexus requirement acts of piracy due to the "transient nature" of such offenses which necessarily occur outside the jurisdiction of any state. (*Id.*) However, Mr. Correa's cherry-picked quotes from *Shi* are not conclusive. In *Shi* the Ninth Circuit expressly states that (1) "[d]ue process does not require a nexus between such an offender and the United States because the universal condemnation of the offender's conduct puts him on notice that his acts will be prosecuted by any state where he is found"; and (2) "due process does not require the same nexus between violators of [18 U.S.C.] § 2280 and the United States because § 2280 implements the [Convention for the Suppression

9

of Unlawful Acts Against the Safety of Maritime Navigation ("Maritime Safety

Convention"), Mar. 10, 1988, S. Treaty Doc. No. 101-1, 1678 U.N.T.S. 221], which

expressly provides foreign offenders with notice that their conduct will be prosecuted by

any state signatory." 525 F.3d at 723. It is true that the Ninth Circuit considered Mr.

Shi's crimes to constitute acts of piracy occurring in international waters. However, this

Court finds no evidence that the Ninth Circuit intended the above language to be limited

to crimes of piracy. *Accord Ali*, 718 F.3d at 944–45 (explaining that the Ninth Circuit's

reasoning in *Shi* was driven by "the 'universal condemnation of the offender's conduct,'

not some theory of universal jurisdiction" as would apply to piracy.)[4]

Of course, *Shi* is not the only case which concludes that means other than nexus

to the United States can satisfy Constitutional Due Process. As the Government points

out, and Mr. Correa recognizes, the Third, Eleventh, and D.C. Circuits have all held that

universal condemnation and/or international treaties provide defendants with the

necessary forewarning to satisfy Due Process's central concern that prosecution in this

country is not arbitrary or fundamentally unfair. (Doc. # 98 at 11-15; Doc. # 101 at 5–

---

[4] The concept of universal jurisdiction differs from universal condemnation. As the Second Circuit explained in *Yousef*, international treaties do not create universal jurisdiction: "[w]hile the purpose of [international treaties with provisions requiring extradition or prosecution] is to assure 'universal punishment of the offenses in question' . . . it is incorrect to speak of these treaties as creating 'universal jurisdiction,' or even 'treaty-based universal jurisdiction,' because the treaties create obligations only in States party to them, not universally in all states." *Yousef*, 327 F.3d at 95 n.29 (interpreting a provision in the Montreal Convention requiring extradition or prosecution). Whether torture is subject to universal jurisdiction is not an issue in this case because the statute under which Mr. Correa is charged explicitly provides for U.S. jurisdiction when "the alleged offender is present in the United States, irrespective of the nationality of the victim or alleged offender" and because Mr. Correa has not raised any jurisdiction-related arguments. 18 U.S.C. § 2340A(b)(2); *see also Shi*, 525 F.3d at 722 (explaining that jurisdiction to apply U.S. criminal statutes extraterritorially is a separate question from whether such application violates the Due Process Clause of the Fifth Amendment).

19); *see, e.g.*, *United States v. Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2001) ("Since drug trafficking is condemned universally by law-abiding nations, we reasoned [in *Martinez-Hidalgo*, 993 F.2d at 1056–57] that there was no reason for us to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of a person apprehended with narcotics on the high seas."); *United States v. Gruezo*, 66 F.4th 1284, 1293 (11th Cir. 2023) (holding that prosecution of drug trafficking on the high seas does not require a nexus to the United States because its universal condemnation by law-abiding nations makes prosecution "not 'fundamentally unfair'") (collecting cases); *Ali*, 718 F.3d at 944 (concluding that where an international treaty provides "global notice that certain generally condemned acts are subject to prosecution by any party to the treaty" the Due Process Clause is satisfied). Additionally, a powerful dissent from the First Circuit, cited by both parties, recognizes that "under the international law doctrine of universal jurisdiction (UJ), a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens." *United States v. Cardales-Luna*, 632 F.3d 731, 740 (1st Cir. 2011) (Torruella, J., dissenting); *see* (Doc. # 98 at 17; Doc. # 101 at 9–10.)

Thus, upon review of the case law the Court concludes that the only clear circuit split regarding the requirements of due process in the extraterritorial application of U.S. criminal law relates to prosecution of drug traffickers under the MDLEA. *Compare, e.g.*, *United States v. Cardales*, 168 F.3d 548, 554 (1st Cir. 1999) ("When the foreign flag nation consents to the application of United States law, jurisdiction attaches under the statutory requirements of the MDLEA without violation of due process or the principles

11

of international law because the flag nation's consent eliminates any concern that the application of United States law may be arbitrary or fundamentally unfair."); *United States v. Suerte*, 291 F.3d 366, 372 (5th Cir. 2002) (same); *with Shi*, 525 F.3d at 722 (explaining that the *Davis* prosecution pursuant to the MDLEA required a nexus to the United States to satisfy Due Process because "some states do not consider [possession of narcotics on the high seas] criminal." (citing *Davis*, 905 F.2d at 248–49) (internal quotation marks omitted)).

Mr. Correa points to only two cases in which lack of nexus resulted in dismissal, or reversal and remand upon appeal: *United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006), and *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (9th Cir. 2006). (Doc. # 98 at 7–8, 12.) *Perlaza*, unlike the later-decided *Shi*, involved another prosecution of drug trafficking on the high seas pursuant to the MDLEA. 439 F.3d at 1157. As discussed above, the Ninth Circuit has held that such prosecutions require a nexus because possession of narcotics in international waters is not a universally condemned offense. *Shi* 525 F.3d at 722; *see also Perlaza*, 439 F.3d at 1169.

In *Sidorenko*, the district court concluded that the indictment, which charged bribery and wire fraud by noncitizen defendants who acted entirely outside the United States, must be dismissed because the statutes at issue (1) did not overcome the statutory-interpretation canon against extraterritoriality, and (2) could not be applied to the defendants' conduct consistent with the Due Process Clause due to lack of nexus between the crimes and the United States. 102 F. Supp. 3d at 1132–34. The Government argues that *Sidorenko* is inapposite for two reasons. First, because the

court's initial holding, that the bribery and wire fraud statutes do not expressly apply extraterritorially, renders its second holding—regarding due process—dicta. (Doc. # 101 at 9 n.5.) Second, the Government contends that bribery and wire fraud are not universally condemned crimes and, therefore, *Sidorenko* sheds no light on whether universal condemnation is another means of satisfying due process. (*Id.*) This Court need not fully determine the strength of these arguments because it does not find *Sidorenko* persuasive in the context of the instant case. This Court is not bound by the decisions of a sister district court, especially one outside the jurisdiction of the Tenth Circuit. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *see also United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("In any event, district courts in this circuit are bound by our decisions and those of the United States Supreme Court—they are not bound by decisions of other district courts, much less district courts in other circuits."). Further, *Sidorenko* does not wrestle with the holdings in *Shi*, even though *Shi* was binding precedent on the Northern District of California when *Sidorenko* was decided.

In summary, with the exception of *Sidorenko*, outside the MDLEA/drug trafficking context,[5] all circuit courts which have considered the question have either (1) found

---

[5] The defendant in *United State v. Ibarguen-Mosquera*, 634 F.3d 1370 (11th Cir. 2011), was prosecuted pursuant to the Drug Trafficking Vessel Interdiction Act, which prohibited operating any unflagged semi-submersible vessel in international waters with the intent to evade detection. 18 U.S.C. § 2285 (2010). Like the MDLEA cases, *Ibarguen-Mosquera* revolves around the U.S. prosecution of drug trafficking by noncitizens in international waters. As in *Caicedo*, 47 F.3d at 372, *Ibarguen-Mosquera* holds that prosecution of stateless vessels engaged in drug trafficking "does not offend the Due Process Clause" because stateless vessels are "'international pariahs' that have 'no internationally recognized right to navigate freely on the high seas.'" 634 F.3d at 1379 (quoting *United States v. Marino-Garcia*, 679 F.2d 1373, 1382 (11th Cir. 1985)).

nexus and stopped their analysis there, *see, e.g.*, *Al Kassar*, 660 F.3d at 118; *Yousef*, 327 F.3d at 111–12; *Mohammad-Omar*, 323 F. App'x at 261–62; *United States v. Rojas*, 812 F.3d 382, 393 (5th Cir. 2016); *United States v. Lawrence*, 727 F.3d 386, 396 (5th 2013); *United States v. Iossifov*, 45 F.4th 899, 914 (6th Cir. 2022); or, (2) concluded that universal condemnation or treaty implementation can also satisfy due process, *see, e.g.*, *United States v. Murillo*, 826 F.3d 152, 157 (4th Cir. 2016); *Shi*, 525 F.3d at 722–24; *United States v. Noel*, 893 F.3d 1294, 1303–04 (11th Cir. 2018); *Ali*, 718 F.3d at 944. It is undisputed that Mr. Correa's prosecution does allege drug trafficking, therefore the Ninth Circuit's requirement of a nexus to the United States in that context sheds only minimal light on the question currently before this Court.

At the heart of all these cases—whether they employ a nexus analysis, or rely on international treaties or universal condemnation—is the Due Process Clause's requirement that a defendant receive fair warning that he could face prosecution for his actions. As the Supreme Court has explained, fair warning requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964). Some circuits appear to require that this warning refer specifically to potential U.S. prosecution, requiring an indication that a defendant "should reasonably anticipate being haled into court in this country." *See, e.g.*, *United States v. Moreno-Morillo*, 334 F.3d 819, 827 (9th Cir. 2003) (internal quotation marks and citation omitted); *Noel*, 893 F.3d at 1303–04. However, other circuits have held "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so

long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Epskamp*, 832 F.3d at 169; *Martinez-Hidalgo*, 993 F.2d at 1056; *Murillo*, 826 F.3d at 157; *Ali*, 718 F.3d at 944.

Accordingly, the Court concludes that this fair warning is the fundamental consideration it must look for in determining whether Mr. Correa's prosecution violates the Fifth Amendment's Due Process Clause. The Court will assess international treaties, universal condemnation, and nexus for indications of the existence of such fair warning under the facts alleged in the instant case.

      1.   <u>Treaty Implementation</u>

The Government argues that its prosecution of Mr. Correa conforms with the Due Process Clause's fair warning requirement because he has been charged under the Torture Act, 18 U.S.C. §§ 2340–2340A, which codifies the United States' obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"), G.A. Res. 39/46, U.N. Doc. A/RES/39/46, 1465 U.N.T.S. 85, S. Treaty Doc. No. 100-20 (Dec. 10, 1984). (Doc. # 101 at 13–16.) According to the Government, the CAT, combined with or independent of the universal condemnation of torture, provides Mr. Correa with all the fair warning of potential U.S. prosecution required by the Due Process Clause. (*Id.*) The Court agrees.

*Shi* is persuasive in this regard. The statute under which Mr. Shi was prosecuted, 18 U.S.C. § 2280, codifies the Unites States' obligations under the Maritime Safety Convention. Both the Maritime Safety Convention and the CAT require any signatory state to extradite or prosecute offenders, regardless of where the offenders act

occurred. *Compare* Maritime Safety Convention at Art. 10, ¶ 1 ("The State Party in the territory of which the offender or the alleged offender is found shall . . . if it does not extradite him, be obliged, without exception whatsoever and whether or not the offence was committed in its territory, to submit the case without delay to its competent authorities for the purpose of prosecution"); *with* CAT at Art. 7, ¶ 1 ("The State Party in the territory under whose jurisdiction a person alleged to have committed any offence [proscribed above] is found shall . . . if it does not extradite him, submit the case to its competent authorities for the purpose of prosecution."). The domestic statutes implementing these treaties—§ 2280 and § 2340A, respectively—authorize jurisdiction over any offender "later found" (in the case of § 2280(b)(1)(C)), or "present" (§ 2340A(b)(2)) in the United States after a prohibited act is committed.

Because, as discussed in greater detail below, torture is a universally condemned crime, the existence of the CAT provided Mr. Correa "with all the notice due process requires that he could be prosecuted in this country." *Shi*, 525 F.3d at 724; *see also Ali*, 718 F.3d at 945 ("In other words, the treaty at issue in *Shi* did what the International Convention Against the Taking of Hostages [("Hostage Treaty")] does here: provide[s] global notice that certain generally condemned acts are subject to prosecution by any party to the treaty. We agree with the Ninth Circuit that the Due Process Clause demands no more.") Accordingly, Mr. Correa's prosecution in the United States is "neither arbitrary nor fundamentally unfair." *Id.* (quoting *Moreno-Morillo*, 334 F.3d at 828 n.7).

Mr. Correa counters that The Gambia did not ratify the CAT until 12 years after his alleged criminal conduct. (Doc. # 98 at 16–17; Doc. # 104 at 4–5.) According to Mr. Correa, "[a] foreign national of a country that has yet to ratify [the CAT] cannot be presumed to have received adequate notice that his conduct occurring within the sovereign territory of the non-member nation would somehow subject him to prosecution in a federal court 5,000 miles away." (Doc. # 104 at 4); *see also* (Doc. # 98 at 16.)

Mr. Correa's point is well taken. However, the Courts which have previously considered whether the existence of a global treaty satisfies Constitutional due process requirements have not held that such satisfaction relies on the membership of the noncitizen's home state in the international treaty or convention. *Shi*, 525 F.3d at 724; *Noel* 893 F.3d at 1304; *Ali*, 718 F.3d at 945. In fact, in *Ali*, the D.C. Circuit explicitly held that the Hostage Treaty "provided global notice satisfying due process concerns notwithstanding the fact that the offender was a national of Somalia, which was not a signatory nation." *Noel*, 893 F.3d at 1304 n.6 (discussing *Ali*, 718 F.3d at 945). Similarly, of course, the Government need not establish that Mr. Correa directly received actual notice that torture could be punished in any nation-signatory to the CAT. Apart from "highly technical statutes that present[ ] the danger of ensnaring individuals engaged in apparently innocent conduct,"—which are not at issue in Mr. Correa's case—due process does not require actual knowledge of the potential fora for prosecution, and ignorance of the law is no defense. *Bryan v. United States*, 524 U.S. 184, 194 (1998); *United States v. Reddick*, 203 F.3d 767, 771 (10th Cir. 2000); *see also Epskamp*, 832

F.3d at 169 (averring that knowledge of U.S. jurisdiction is "legally irrelevant for purposes of due process.").

In all relevant aspects, the international treaties and implementing statutes at issue in *Shi* and *Ali*, are nearly identical to the CAT and § 2340A. Finding these decisions persuasive, this Court concludes that the existence of the CAT, combined with the blatantly criminal nature of the acts (discussed below) of which Mr. Correa is accused, provided all the fair warning necessary for Mr. Correa's prosecution in the United States under the Torture Act to comport with due process.

      2.   <u>Universal Condemnation</u>

The Government next points to multiple circuit court cases which held that the Fifth Amendment's Due Process Clause is satisfied in the case of extraterritorial crimes when the conduct at issue is universally condemned or self-evidently criminal. (Doc. # 101 at 10–13 (citing, e.g., *Perez-Oviedo*, 281 F.3d at 403 (holding no nexus is required to prosecute international drug trafficking because such conduct "is condemned universally by law-abiding nations"); *Murillo*, 826 F.3d at 157–58 (finding that prosecuting an extraterritorial murder satisfied due process because it was "self-evidently criminal"); *Shi*, 525 F.3d at 723 (concluding no nexus was required when the defendant's acts constituted piracy and piracy was universally condemned)).)

Mr. Correa disputes that universal condemnation is a means of satisfying the Due Process Clause in cases like his. However, he only directly discusses *Shi*, which he argues excepts only instances where "United States criminal statutes are applied to foreign defendants apprehended on stateless vessels" (Doc. # 104 at 2–3 (citing *Shi*,

525 F.3d at 722)), and does so "solely as a consequence of the vessels status as stateless." (*Id.* (quoting *Caicedo*, 47 F.3d at 372).)

First, the Court notes that Mr. Correa's reading of *Shi's* holding as limited to crimes occurring on stateless vessels is improbable in light of the fact that *Shi* itself did not involve a stateless vessel. 525 F.3d at 718. Rather, as discussed above, the Court reads *Shi* as relying on previous case law, including that which determined no nexus was required in cases involving stateless vessels, to conclude that there exist multiple means of satisfying the Due Process Clause when prosecuting extraterritorial crimes. *Id.* at 722–24. Further, as also discussed above, the Court does not find evidence in *Shi's* broad language to conclude that the Ninth Circuit intended its holding to apply only to piracy, "transient" crimes, or crimes occurring outside the jurisdictional boundaries of any state. *Id.*; *accord Ali*, 718 F.3d at 944–45.

Mr. Correa also provides no arguments regarding the other circuits' holdings—in cases involving crimes other than piracy or acts committed aboard stateless vessels—that due process is not violated when a crime is universally condemned, even in the absence of a nexus to the United States. For example, in *Perez-Oviedo*, the Third Circuit explained:

> [W]e previously held in *Martinez-Hidalgo* that no due process violation occurs in an extraterritorial prosecution under the MDLEA when there is no nexus between the defendant's conduct and the United States. *Martinez-Hidalgo*, 993 F.2d at 1056–57. Since drug trafficking is condemned universally by law-abiding nations, we reasoned that there was no reason for us to conclude that it is "'fundamentally unfair' for Congress to provide for the punishment of a person apprehended with narcotics on the high seas." *Id.* at 1056; see also 46 U.S.C. App. § 1902 (where Congress specifically found in the MDLEA that "trafficking in controlled substances

aboard vessels is a serious international problem and is universally condemned").

281 F.3d at 403. Similarly, in *Murillo*, the Fourth Circuit stated:

> Simply put, a defendant is "not ensnared by a trap laid for the unwary" when he has engaged in conduct that "is self-evidently criminal." *See Brehm*, 691 F.3d at 554 (quoting *Al Kassar*, 660 F.3d at 119). Because kidnapping and murder are "self-evidently criminal," it was not fundamentally unfair to prosecute [the defendant] in the United States. [Collecting cases]. Absent fundamental unfairness, [the defendant's] Fifth Amendment due process claim fails under *Brehm*.

826 F.3d at 157. Neither *Perez-Oviedo* nor *Murillo* involved stateless vessels, or piracy. Further, *Murrillo* involved a murder which occurred entirely within the country of Colombia. *Id.* at 153–54. Accordingly, the Court concludes that these cases support a finding that due process's fair warning requirement is met when universally condemned or self-evidently criminal conduct is prosecuted in the United States.

The question then is, is torture a universally condemned or self-evidently criminal act? Mr. Correa argues that it is not. (Doc. # 98 at 17.) In support, he points to case law holding that universal jurisdiction applies to very limited crimes: piracy, stateless vessels, and slave trading. (*Id.*); *Yousef*, 327 F.3d at 105 (listing "war crimes" and "crimes against humanity" as recently recognized crimes—in addition to piracy—for which universal jurisdiction exists because such crimes "(1) are universally condemned by the community of nations, and (2) by their nature occur either outside of a State or where there is no State capable of punishing, or competent to punish, the crime (as in a time of war)."); *Shi*, 525 F.3d at 722 (explaining that the *Davis* prosecution required a nexus to the United States because "some states do not consider [possession of narcotics on the high seas] criminal." (citing *Davis*, 905 F.2d at 248–49)) (internal

quotation marks omitted); *see also Cardales-Luna*, 632 F.3d at 746 (Torruella, J.,

dissenting) (expounding that the United Nations Convention on the Law of the Sea—

which "is regarded as expressing customary international law on the subject [of

universal jurisdiction]"—only classifies piracy and the salve trade as subject to universal

jurisdiction).

Mr. Correa also points out that some courts have concluded that even terrorism

and murder are not universally condemned crimes. *United States v. Furlong*, 18 U.S. (5

Wheat.) 184, 196–97 (1820) (holding Congress could not punish the murder of a

foreigner by a foreigner on a foreign vessel in international waters because, murder is

"an offence too abhorrent to the feelings of man, to have made it necessary that it also

should have been brought within this universal jurisdiction."); *Yousef*, 327 F.3d at 107–

08 ("[T]errorism—unlike piracy, war crimes, and crimes against humanity—does not

provide a basis for universal jurisdiction."). *But see Cardales-Luna*, 632 F.3d at 746

(Torruella, J., dissenting) ("Although the exact contours of what crimes come within UJ

are not established with precision, there is a general consensus that to qualify for UJ the

crime involve egregious, violent human rights abuses."); *Murillo*, 826 F.3d at 157–58

(holding that kidnapping and murder were "self-evidently criminal so as to thwart the

argument that [defendant's] prosecution was fundamentally unfair").

On the other hand, the Government argues that torture—although not a universal

jurisdiction offense—is both universally condemned and self-evidently criminal. (Doc. #

101 at 10–13.) Section 2340(1) defines torture as "an act committed by a person acting

under the color of law specifically intended to inflict severe physical or mental pain or

suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." The acts constituting torture for which Mr. Correa is charged include repeatedly beating victims with fists and objects, electrocuting victims—including on their genitals, dripping molten plastic or acid on victims' bodies, extinguishing cigarettes on victims' skin, restricting a victim's ability to breath by placing a plastic bag over his head, and threatening a victim with death by placing the barrel of a pistol in his mouth. (Doc. # 1 at ¶¶ 33–38.) These acts were allegedly engaged in for the purpose of extracting confessions. (*Id.* at ¶ 31.)

The Court agrees that the universal condemnation of torture and/or self-evidently criminal nature of the acts Mr. Correa is alleged to have engaged in, are sufficient to satisfy the Due Process Clause's fair warning requirement. The Supreme Court and circuit courts have discussed the universal repugnancy of torture, placing it on par with genocide and slavery. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401–02 (2018); *Filartiga v. Peña-Irala*, 630 F.2d 876, 890 (2d Cir. 1980) ("Among the rights universally proclaimed by all nations, as we have noted, is the right to be free of physical torture. Indeed, for purposes of civil liability, the torturer has become like the pirate and slave trader before him hostis humani generis, an enemy of all mankind."). Further, some circuits have proclaimed that the prohibition on torture "has attained the status of *jus cognes* under international law"—that is, of a norm applying "universally to states and individuals." *Nuru v. Gonzalez*, 404 F.3d 1207, 1222–23 (9th Cir. 2005); *see also Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) ("[W]e

conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*.").

Of course, in addition to the CAT, the Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc. A/810, art. 5 (Dec. 10, 1948), and the International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Treaty Doc. No. 95-20, 999 U.N.T.S. 171, art. 7,[6] recognize the right of all persons to be free from torture. Finally, "torture is illegal under the law of virtually every country in the world." *Nuru*, 404 F.3d at 1223 n.11 (collecting nine examples in addition to the United States including Ethiopia, Iran, and Russia).

The Court finds these sources highly persuasive and concludes that Mr. Correa's prosecution in the United States for torture as defined at 18 U.S.C. § 2340(1) satisfies the Due Process Clause's fair warning requirement "because the universal condemnation of [his alleged] conduct puts him on notice that his acts will be prosecuted by any state where he is found." *Shi*, 525 F.3d at 723.

3.    Nexus

Having concluded that Mr. Correa's prosecution in the United States does not offend constitutional due process concerns because he is alleged to have committed an offense (1) in violation of a statute implementing an international treaty which provided global notice of proscribed conduct, and/or (2) which is universally condemned such that he was on notice of potential future prosecution, the Court need not also decide

---

[6] The Court notes that The Gambia is a state party to this Covenant as of March 27, 1973. International Covenant on Civil and Political Rights, 999 U.N.T.S. at 264.

whether there is a sufficient nexus to the United States to independently satisfy due process. However, because of the unsettled nature of the law in this circuit, the Court will also assess whether such a nexus exists as an alternative holding.

The Government argues that "even if [Mr.] Correa is correct that nexus is required to meet due process, such a nexus is present here" because (1) Mr. Correa willfully came to the United States and sought safe haven in this country, and/or (2) one of Mr. Correa's alleged victims was a dual U.S.-Gambian citizen at the time he was tortured. (Doc. # 101 at 16–21.) Mr. Correa argues that neither "nexus" is sufficient to satisfy the Due Process Clause. (Doc. # 104 at 5–8.) The Court agrees with the Government.

### a.   Presence in the United States

First, Mr. Correa argues that nexus is not satisfied by his current presence in the United States because the required nexus refers to a connection "between the *criminal conduct* and the United States sufficient to justify the United States' pursuit of its interests." (Doc. # 104 at 5 (quoting *Caicedo*, 47 F.3d at 372) (alteration in brief maintained).) Once again, the Court finds Mr. Correa's representation of the case law in this regard to be overly simplistic. It is true that some courts have defined nexus when applied to extraterritorial crimes as existing "when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118. However, in *Davis*, the foundational case establishing the nexus test, the language used by the Ninth Circuit is: "a sufficient nexus between the **defendant** and the United

States, . . . so that such application would not be arbitrary or fundamentally unfair." *Davis*, 905 F.2d at 249–50 (emphasis added) (citation omitted).

Several courts which considered the existence of nexus have concluded that connections between the defendant and the United States are sufficient, even where a defendant "did not target his conduct toward American soil or American commerce." *Brehm*, 691 F.3d at 552. For example, in *United States v. Emmanuel*, No. 06-20758-CR, 2007 WL 2002452 (S.D. Fla. July 5, 2007), Mr. Emmanuel was alleged to have tortured individuals of unknown nationality entirely within the country of Liberia for the purpose of obtaining information about "actual, perceived, or potential opponents" to the then-Liberian president. *Id.* at *4–*5. Like Mr. Correa, Mr. Emmanuel argued that his prosecution in the United States violated the Due Process Clause because "there is no nexus between the criminal conduct and his contacts with the United States." *Id.* at *15. The district court however, concluded "[t]he nexus requirement [was] satisfied by the allegation that [Mr. Emmanuel] was born in the United States" and was therefore a presumptive citizen of this country. *Id.* at *16. In other words, it was Mr. Emmanuel's personal connection with this country—rather than any relationship between his conduct and the United States—which the court concluded was sufficient to establish nexus for the purposes of due process.

Similarly, although not relying exclusively on the nexus test, the Eleventh Circuit found sufficient "contact" between the defendant and the United States to satisfy due process in *United States v. Baston*, 818 F.3d 651, 669–70 (11th 2016). Mr. Baston, a national of Jamaica who resided illegally in the United States after purchasing the

identity of a U.S. citizen, was charged and convicted at trial with trafficking women for sex both in the United States and internationally. *Id.* at 656–58. Despite his conviction, the trial court refused to award full restitution to one of his victims for trafficking she was subjected to outside the United States. *Id*. at 660. The Government appealed and the Eleventh Circuit concluded that extraterritorial application of the Trafficking Victim Protection Reauthorization Act of 2008, including its restitution provisions, to Mr. Baston was not arbitrary or fundamentally unfair because, amongst other things, Mr. Baston "resided in Florida, where he rented property, started a business, and opened bank accounts." *Id.* at 669–70. Additionally, he was "present at his mother's home in New York when arrested." *Id.* at 670. The Eleventh Circuit reasoned that requiring Mr. Baston to pay restitution for trafficking which occurred abroad was not arbitrary or unfair because he "used this country as a home base and took advantage of its laws; [thus,] he cannot now complain about being subjected to those laws." *Id.*

Mr. Correa's connections to, and contacts with the United States in the years following his alleged crimes are not as extensive or deep as those alleged in *Emmanuel* and *Baston*. However, as the Government points out, unlike many of the cases in which defendants challenged the extraterritorial application of U.S. criminal statutes on due process grounds, Mr. Correa was not apprehended in international waters or extradited from another country. Rather, like Mr. Baston, Mr. Correa came to this country of his

own accord, and sought to make a life here. (Doc. # 101 at 3–4, 17–19.) His voluntary

contacts with the United States, and this district, are undeniable.[7]

Further, it cannot be said that there is no U.S. interest at stake in the current

prosecution. *See Caicedo*, 47 F.3d at 372 (explaining that the nexus must be "sufficient

to justify the United States' pursuit of its interests."). As Justice Breyer explained in a

concurring opinion, the "distinct interest in preventing the United States from becoming

a safe harbor (free of civil as well as criminal liability) for a torturer or other common

enemy of mankind" is "an important American national interest." *Kiobel v. Royal Dutch

Petroleum Co.*, 569 U.S. 108, 127 (2013) (Breyer, J., concurring).

As discussed at the outset, the burden on a defendant seeking to avoid

extraterritorial application of a U.S. criminal statute which explicitly provides for such

application, "is a heavy one." *Epskamp*, 832 F.3d at 168 (citation omitted). This is true

even in cases where the court considered solely whether due process was satisfied by

a sufficient nexus to the United States. *Id.* The Court concludes that Mr. Correa's

---

[7] To the extent that Mr. Correa puts forth arguments that due process in his case requires similar "minimum contacts" to those required for federal courts to exercise personal jurisdiction over non-resident corporations (Doc. # 98 at 7, 9, 19–20), the Court finds such arguments inapplicable as this is not a civil case, and Mr. Correa has not challenged this Court's jurisdiction. *See United States v. Bowman*, 260 U.S. 94, 98 (1922) (explaining that the jurisdictional requirements of civil cases should not be applied to "criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction."). *But see, e.g.*, *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (explaining that "[t]he nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction."). The Court notes, however, that to the extent minimum contacts are needed to exercise jurisdiction, such contacts are satisfied by Mr. Correa's physical presence in the forum. *Ford v. United States*, 273 U.S. 593, 607 (1927) ("The court had jurisdiction to try the offense charged in the indictment and the defendants were in its jurisdiction because they were actually in its custody."); *see also, e.g.*, 18 U.S.C. § 3238 (venue proper for prosecution for extraterritorial conduct in the district where the defendant "is arrested or is first brought").

argument that there exists no nexus between his alleged criminal activity and this country fails to meet that burden. Mr. Correa's voluntary travel to the United States and choice to overstay his visa provided him with sufficient fair warning that he could be subject to this country's laws.

        *b.*    *Citizenship of Victim 2*

Finally, the Government argues that, at least as it relates to Victim 2 listed in Count 3 of the indictment, that individual's dual U.S.-Gambian citizenship establishes a sufficient nexus between Mr. Correa and this country to satisfy the Due Process Clause. (Doc. # 101 at 20–21.) The Court agrees. Numerous circuits which have considered similar questions have concluded that the prosecution of criminal acts by noncitizens abroad comports with due process where the alleged victim was a U.S. citizen. *Murillo*, 826 F.3d at 157 (concluding that a noncitizen could be prosecuted in the United States for the murder of an American diplomatic agent in Colombia because "the United States has a significant interest in protecting" such individuals); *Iossifov*, 45 F.4th at 914 (holding that nexus to the United States sufficient to satisfy due process existed where the defendant defrauded American victims); *Noel*, 893 F.3d at 1305 ("Assuming arguendo that some significant state interest . . . is required, we believe the fact that the hostage was a United States citizen satisfies any such requirement."). Sufficient nexus was found even where U.S. citizenship was unknown to the defendant at the time of the alleged criminal conduct and was unconnected to his motivations for engaging in criminal activity. *Murillo*, 826 F.3d at 157. This Court sees no reason why this rationale

would not equally apply to a dual citizen. See *Noel*, 893 F.3d at 1305 ("Protection of our own citizens abroad is obviously an important interest of the United States.").

In summary, the Court concludes that nexus to the United States is not required to bring Mr. Correa's prosecution in line with the Fifth Amendment's Due Process Clause. However, even if such nexus were required, it is satisfied in the instant case by Mr. Correa's willful travel to the United States and prolonged presence in this country. In the case of charges related to Victim 2, an additional nexus exists as a result of that victim's dual U.S.-Gambian citizenship.

**B.   CONSTITUTIONALITY OF THE TORTURE ACT**

Turning to Mr. Correa's Motion to Dismiss the Indictment: The Torture Act is Unconstitutional (Doc. # 99), Mr. Correa acknowledges that under longstanding Supreme Court precedent, *Missouri v. Holland*, 252 U.S. 416 (1920), Congress has the authority to enact laws codifying the United States' obligations under valid treaties pursuant to the Constitution's necessary and proper clause. *Id.* at 432; *see also United States v. Lue*, 134 F.3d 79 (2d Cir. 1998); *United States v. Belfast*, 611 F.3d 783, 802 (11th Cir. 2010). However, Mr. Correa points out that in *Bond v. United States*, 572 U.S. 844, 874 (2014) (Scalia, J., concurring), a minority of Supreme Court justices concluded that the text and structure of the Constitution do not support reliance on the necessary and proper clause as a source of congressional authority to enact legislation implementing treaties, and some independent Article I, Section 8 power must be identified. (Doc. # 99 at 2 (citing *Bond*, 572 U.S. at 874–80) (Scalia, J., concurring).)

29

Mr. Correa admits that "this Court is not free to adopt Justice Scalia's viewpoint and dismiss [his] indictment given the holding in *Missouri*." (Doc. # 99 at 3.) Accordingly, Mr. Correa presents the argument that the passage of the Torture Act was an unconstitutional exercise of Congressional authority for preservation purposes only. Bound by Supreme Court precedent, this Court denies the motion.

### III.  CONCLUSION

Based on the foregoing, the Court ORDERS that Defendant Michael Sang Correa's Motion to Dismiss the Indictment Pursuant to the Fifth Amendment Due Process Clause (Doc. # 98), and Motion to Dismiss the Indictment: The Torture Act is Unconstitutional (Doc. # 99), are DENIED.

DATED: February 28, 2024

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge