**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Criminal Action No. 20-cr-00148-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL SANG CORREA,

      Defendant.

---

**ORDER REGARDING MOTIONS *IN LIMINE***

---

This matter is before the Court on both parties' motions *in limine*. *See generally* (Docs. ## 152 (Government's motions), 153–54 (Defendant Michael Sang Correa's motions)); *see also* (Docs. ## 159–60 (Government's responses))[1]. For the following reasons, the Court grants the Government's first, third, fourth, and fifth motions *in limine*, as well as Mr. Correa's second motion. The Court reserves ruling on the Government's second motion (related to a witness's asylum proceedings) and Mr. Correa's first motion (concerning the Government's psychological expert).

## I.    <u>BACKGROUND</u>

The Court incorporates its previous recitation of the facts and procedural history of this case as stated in its Order Denying Defendant's Motion to Dismiss the

---

[1] Mr. Correa has not filed a response to the Government's motions.

Indictment. (Doc. # 105 at 1–3.) In short, the Government has charged Mr. Correa with torture and conspiracy to commit torture for acts allegedly committed by Mr. Correa following a failed coup d'état in The Gambia in 2006, while that Country was ruled by former-President Yahya Jammeh. (*Id.*; Doc. # 1.) A ten-day jury trial in this case is scheduled to begin on September 16, 2024. (Doc. # 94 at 3.)

On August 16, 2024, the parties both filed motions *in limine* seeking the exclusion or limitation of witness testimony. (Docs. ## 152–54.) The Government asks the Court to preclude or otherwise limit cross-examination pertaining to five categories of information related to witnesses' other acts, immigration proceedings, and arrests or criminal convictions. (Doc. # 152 at 1–2.) Mr. Correa asks this Court to limit or exclude the testimony of the Government's proposed (1) expert in the psychological effects of trauma caused by physical abuse, Dr. Adeyinka Akinsulure-Smith (Doc. # 153), and (2) historical expert in African Studies, Dr. Maggie Dwyer (Doc. # 154). Both parties invoke Federal Rules of Evidence 401, 402, and 403. (Doc. # 152 at 3; Doc. # 153 at 1–2, 5; Doc. # 153 at 2–3, 6–7.) In addition, the Government's Motion invokes Rules 404(a)(3), 608(b), 609, and 611, while Mr. Correa's Motions center on Rule 702 and 703. *See generally* (Docs. ## 152–54.) Neither party requested a hearing.

## II.  STANDARD OF REVIEW

"A creature of neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence, the motion *in limine* gives the court the opportunity to take up before trial those certain and limited evidentiary issues in order to minimize interruptions at trial." *Deghand v. Wal-Mart Stores, Inc.*, 980 F. Supp. 1176, 1179 (D.

Kan. 1997). Pretrial rulings may save time at trial and save the parties time, effort, and cost in preparing their cases. *Id.* However, in many cases, such rulings are better left until trial when the Court can assess the question considering the evidence presented at trial. *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1385, 1387–88 (D. Kan. 1998).

The moving party "has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, No. 17-cv-01595-CMA-NRN, 2020 WL 1452166, at *3 (D. Colo. Mar. 25, 2020) (quoting *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1082 (D. Kan. 2000)). Denial of a motion *in limine*, however, does not mean that all of the evidence contemplated by the motion will automatically be admitted at trial. *Id.* Rather, "the court may alter its limine ruling based on developments at trial or on its sound judicial discretion." *Id.* (quoting *First Sav. Bank*, 117 F. Supp. 2d at 1082). Further, a ruling *in limine* does not "relieve a party from the responsibility of making objections, raising motions to strike, or making formal offers of proof during the course of trial." *Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir. 1987).

## III.   APPLICABLE LAW

### A.   RULES 401 AND 402

"Federal Rule of Evidence 402 provides that 'irrelevant evidence is not admissible.'" *Burke v. Regalado*, 935 F.3d 960, 1018 (10th Cir. 2019). Evidence is relevant if: it has "any tendency to make a fact more or less probable" and said fact is material, *i.e.*, the fact "is of consequence in determining the action." Fed. R. Evid. 401. On the other hand, The Court has broad discretion over evidentiary relevance

determinations. *E.g.*, *United States v. Neal*, 718 F.2d 1505, 1509–10 (10th Cir. 1983).

"The bar for admission under Rule 401 is very low." *United States v. Jordan*, 485 F.3d

1214, 1218 (10th Cir. 2007) (quotation omitted).

**B.    RULE 403**

Under Rule 403, "[t]he court may exclude relevant evidence if its probative value

is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or]

misleading the jury." Fed. R. Evid. 403. As with Rule 401 determinations, the Court has

broad discretion to determine whether the probative value of the evidence is

substantially outweighed by the danger of unfair prejudice. *Neal*, 718 F.2d at 1510.

Even where other rules create avenues for admissibility, almost all evidence is subject

to the overriding protection of Rule 403. *But see Burke*, 935 F.3d at 1018 (explaining

that evidence of prior convictions admitted under Rule 609(a)(2) is not subject to 403

balancing).

**C.    RULES REGARDING EVIDENCE OF WITNESSES' CHARACTER**

Rule 404(a) states the general rule that "[e]vidence of a person's character or

character trait is not admissible to prove that on a particular occasion the person acted

in accordance with the character trait." Fed. R. Evid. 404(a). However, for witnesses,

character evidence may be admitted under Rules 607, 608, and 609. *Id.* at (a)(3).

Rule 608(b) prohibits the admission, on direct examination, of extrinsic evidence

of specific instances of conduct to "attack or support a witness's character for

truthfulness." Fed. R. Evid. 608(b). Parties may only introduce specific instances of

conduct which might bear upon their truthfulness "by asking the witness on cross-

examination about the incident, not by introducing documents or calling other witnesses." *United States v. Beltran-Garcia*, 338 F. App'x 765, 770 (10th Cir. 2009). The United States Court of Appeals for the Tenth Circuit has explained that "[t]he reason for excluding such extrinsic evidence is to avoid mini-trials that may consume a disproportionate amount of time and confuse the issues." *United States v. Velarde*, 485 F.3d 553, 561 (10th Cir. 2007).

Rule 608(b) specifically carves out an exception to its prohibition on specific instances of conduct for criminal convictions admissible under Rule 609. Fed. R. Evid. 608(b). Rule 609(a)(1) of the Federal Rules of Evidence provides:

> For the purpose of attacking the character for truthfulness of a witness, [ ] evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted . . .

Fed. R. Evid. 609(a)(1). The Tenth Circuit has interpreted this rule to "ordinarily" allow cross examination as to "the nature of that conviction unless, after Rule 403 balancing, the probative value of such evidence is outweighed by its prejudicial effect." *United States v. Howell*, 285 F.3d 1263, 1268–69 (10th Cir. 2002).

In addition, subsection (a)(2) of this rule requires the admission of a criminal conviction where "the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

**D.    RULE 611**

Rule 611(a) of the Federal Rules of Evidence empowers the trial court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a).

**E.    RULES 702 & 703**

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."  Before the expert can offer such opinions, however, the proponent of the testimony must demonstrate, by a preponderance of the evidence, that the expert's testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220–21 (D. Colo. 2008). To do so, the proponent must establish that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702. The trial court acts as a "gatekeeper," reviewing the proffered opinions for both relevance and reliability before determining whether the evidence is admissible under Rule 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993); *Goebel v. Denver &*

*Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Goebel*, 346 F.3d at 992 (quoting *Kumho Tire*, 526 U.S. at 152).

Rule 703 provides further guidance on proper expert testimony. As the Tenth Circuit explained, the rule

> allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed"; and "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*" (emphasis added). In particular, the rule could allow an expert to rely on testimonial hearsay. Of course, Rule 703 cannot override the Confrontation Clause, but we have held that the Rule and the Clause can be reconciled if the expert exercises "independent judgment" in assessing and using the hearsay (and other sources) to reach an expert opinion. [*United States v.*] *Kamahele*, 748 F.3d [984,] 1000 [(10th Cir. 2014)]; *see also United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir.2012).

*United States v. Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015).

Generally, "rejection of expert testimony is the exception rather than the rule." *United States v. Nacchio*, 519 F.3d 1140, 1154 (10th Cir. 2008), *vacated in part on rehearing en banc*, 555 F.3d 1234 (10th Cir. 2009); *see also* Fed. R. Evid. 702, advisory committee' s notes to 2000 amendments. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

## IV.   ANALYSIS

### A.   GOVERNMENT'S MOTIONS *IN LIMINE*

The Government seeks to preclude or limit cross-examination on five categories of information:

> (1) allegations about coup plots in 2015 and/or 2016 in which three victims were involved or are alleged to have been involved; (2) a witness's asylum proceedings; (3) details of a witness's foreign conviction; (4) the arrest of a victim that did not result in a conviction; and (5) the suspected affair of a victim.

(Doc. # 152 at 1.) According to the Government, in their conferral with Mr. Correa he indicated that he did not oppose the Government's requests related to the first, third, fourth, and fifth topics, and would respond regarding the second topic—Witness D's[2] asylum proceedings—after reviewing the motion and discovery. (*Id.* at 1.) No response has been forthcoming, and the Court considers these motions ripe for review.

#### 1.   Alleged Involvement of Three Witnesses in 2015 or 2016 Coup Plot

The Government requests that the Court preclude Mr. Correa from cross-examining three of its witnesses—Witness A, Witness B, and Witness C—regarding their actual or alleged involvement in one or more coup and assassination plots against President Jammeh that took place in approximately 2015 or 2016. (Doc. # 152 at 5–9.) The Government argues that testimony on this topic would be irrelevant, has no bearing

---

[2] A protective order is in place in this case to prevent disclosure of sensitive discovery information including that which may implicate the privacy interests of witnesses. *See generally* (Doc. # 167.) Pursuant to this protective order, the Government filed its motions *in limine* (Doc. # 152) under restriction. In line with the protective order and to protect the interests identified therein, the Court will refer to the witnesses discussed in the Government's motion by a letter.

on the witnesses' characters for veracity, and would likely cause unfair prejudice, jury confusion, and/or waste of time. (*Id.*)

The Court agrees that the witnesses actual or potential involvement in plots against President Jammeh nine to ten years after their alleged torture is not relevant to the facts of consequence at issue in Mr. Correa's trial. The Court further agrees that these actions are not probative for truthfulness and that the danger of unfair prejudice, juror confusion, and waste of time substantially outweighs any potential minimal relevance of such testimony. Accordingly, pursuant to rules 402 and 403, the Court will preclude Mr. Correa from cross-examining these three witnesses on this topic.

2.    Witness D's Asylum Proceedings

The Government intends to call Witness D to testify in this case. Like Mr. Correa, and several other of the Government's anticipated witnesses, Witness D was once a member of the Gambian Armed Forces ("GAF"). (Doc. # 152 at 9.) The Government asserts that Witness D will testify that following the failed 2006 coup in The Gambia, he was arrested, interrogated, beaten, and witnessed others being beaten by Mr. Correa and/or other members of the alleged conspiracy. (*Id.*); *see also* (Doc. # 152-1 at 1.) Witness D eventually left The Gambia and applied for asylum in the United States. (Doc. # 152 at 9; Doc. # 152-1 at 1.) In the course of his immigration proceedings, Witness D was interviewed twice by an Asylum Officer ("AO") who inquired into his participation, as a high-ranking GAF officer, into human rights abuses occurring in The Gambia during the years of his military service. (Doc. # 152 at 9–10); *see also* (Doc. #

152-1 at 1, 4–5.) Witness D denied any involvement in such abuses. (Doc. # 152 at 10; Doc. # 152-1 at 4–5.)

In 2011 the AO issued an Assessment to Refer, a short document which summarizes the applicant's asylum interviews and recommends whether asylum should be granted. (Doc. # 152 at 10 (quoting *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015); Doc. # 152-1.) The AO stated that Witness D "provided testimony that was, in several material respects, believable and consistent with statements contained in his application" and found that Witness D had been persecuted on account of his political opinion. (Doc. # 152-1 at 2.) However, the AO also stated that Witness D's "testimony concerning his army experiences warrants a negative credibility finding, because it was vague, lacked detail and was inconsistent with country conditions." (*Id.*) Specifically, the AO wrote that Witness D's "testimony that he never saw a soldier physically abuse another person is inconsistent with country conditions and implausible." (*Id.* at 4–5.) Finally, the AO went on to conclude that given the "overwhelming" evidence that persecution of Gambian citizens by the military was "commonplace" during Witness D's tenure in the GAF, combined with the GAF's small size and Witness D's leadership therein, Witness D had "failed to establish by a preponderance of evidence that the persecutor bar[3] does not apply." (*Id.* at 5.) Witness

---

[3] The "persecutor bar" is an exclusion from eligibility for asylum for any individual who "ordered incited, assisted, or otherwise participated in the persecution of any person on account of one of the protected [asylum] grounds." 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i). If evidence indicates that a mandatory bar—such as the persecutor bar—applies, "the applicant has the burden of proving by a preponderance of the evidence that the ground does not apply." (Doc. # 152-1 at 5 (citing 8 C.F.R. § 208.13(c)(2)(ii)).)

D's case was referred to an immigration judge for further proceedings but prior to adjudication, Witness D withdrew his application and eventually returned to The Gambia. (Doc. # 152 at 12–13; Doc. # 152-2 at 1.)

The Government moves this Court to preclude Mr. Correa from cross-examining Witness D regarding the AO's two key conclusions: (1) that Witness D had failed to establish that the "persecutor bar" did not apply, and (2) that Witness D warranted a "negative credibility finding." (Doc. # 152 at 9.)

First, the Government argues that the AO's finding that Witness D had "failed to establish by a preponderance of evidence that the persecutor bar does not apply" is inadmissible under Rule 608(b). (Doc. # 152 at 13.) The Government points out that there was no affirmative finding that Witness D was involved in persecution, but even if there was, courts have found that prior acts of violence are not admissible for truthfulness. (*Id.* at 13–14); *see United States v. Lamb*, 99 F. App'x 843, 847 (10th Cir. 2004) ("[A]ssault does not impugn a witness's credibility."); *United States v. Aranda-Diaz*, No. CR 12–2686 JB, 2014 WL 459607, at *5 (D.N.M. Jan. 8, 2014) ("[Defendant's] arrest for domestic violence and child abuse is not, in isolation, probative of his character for truthfulness . . . ."); *see also United States v. Patterson*, 20 F.3d 809, 814 (1st Cir. 1994) (explaining in a prosecution for hijacking an airplane, that cross-examination about a prior hijacking would have been impermissible under Rule 608(b), although it was admissible under Rule 404(b)).

Second, the Government argues that the AO's negative credibility determination is inadmissible. (Doc. # 152 at 15–19.) The Tenth Circuit uses a factor-based test to

analyze whether judicial credibility determinations should be admitted under Rule 608(b):

> (1) whether the prior judicial finding addressed the witness's veracity in that specific case or generally; (2) whether the two sets of testimony [*i.e.*, the testimony in which the lie occurred and the testimony offered in a later proceeding] involved similar subject matter; (3) whether the lie was under oath in a judicial proceeding or was made in a less formal context; (4) whether the lie was about a matter that was significant; (5) how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness; (6) the apparent motive for the lie and whether a similar motive existed in the current proceeding; and (7) whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible.

*United States v. Woodard*, 699 F.3d 1188, 1195 (10th Cir. 2012) (quoting *United States v. Cedeño*, 644 F.3d 79, 82–83 (2d Cir. 2011) (internal quotation marks omitted)). Prior to *Woodard* and *Cedeño*, the Second Circuit had concluded that cross examination into an immigration judge's adverse credibility determination was permissible under Rule 608(b). *United States v. Bagaric*, 706 F.2d 42, 65 (2d Cir. 1983). However, district courts applying the *Woodard*/*Cedeño* factors have concluded that explicit negative credibility findings from other proceedings are inadmissible. *See United States v. Clanton*, No. 23-cr-00328 (KAM), 2024 WL 3443422, at *7–8 (E.D.N.Y. July 17, 2024) (precluding cross-examination regarding Civilian Complaint Review Board finding that officer witness was not credible); *United States v. Robinson*, No. 20-CR-415 (KMW), 2021 WL 3003939, at *2 (S.D.N.Y. July 12, 2021) (finding that cross examination on prior judicial finding that law enforcement witness was not credible because such cross examination "would create an unnecessary mini-trial about the circumstances" of the testimony given more than 10 years ago).

As it relates to the first factor, the AO's negative credibility determination was specific to Witness D's testimony about his military service. (Doc. # 152-1 at 4–5); *see also* (*id.* at 2.) Regarding factor two, the Government asserts that this factor weighs against admission because Witness D's testimony at trial will "focus on his role within the GAF in March 2006, and his arrest, detention, and abuse by the Junglers."[4] (Doc. # 152 at 16.)

The Government admits that because Witness D's testimony before the AO was given under oath and the testimony of his military service was significant in that context, factors three and four weigh in favor of admission of the AO's negative credibility determination. (Doc. # 152 at 16–17.)

Turning to factor five, the AO's negative credibility determination is contained in a Referral Notice dated July 19, 2011. (Doc. # 152-1 at 1.) Thus, it is over 13 years old and there has been no intervening credibility determination. The Court agrees with the Government that this factor weighs against admission. See *Robinson*, 2021 WL 3003939, at *2.

According to the Government, Witness D's motive to lie before the AO—receipt of an immigration benefit—is not present in the instant proceedings as the Government has repeatedly advised Witness D that "his participation in this case will result in no immigration benefits to him." (Doc. # 152 at 17.) Although this may be true, the Court

---

[4] As will be discussed in more detail below, Mr. Correa is alleged to have committed the acts charged in the indictment while a member of a secretive unit within the GAF known as "the Junglers" which allegedly answered directly to President Jammeh and engaged in various human rights abuses on his behalf. (Doc. # 1 at ¶¶ 12, 14; Doc. # 101 at 2.)

notes that Witness D will be testifying at the criminal trial, in the United States, of a fellow GAF member accused of human rights abuses. He may have motive to lie to avoid becoming the target of a similar prosecution.

Turning to the final factor, although the Government offers an explanation for Witness D's allegedly "implausible" testimony—"that the AO placed too much reliance on generic country conditions for a limited period of time" (Doc. # 152 at 18)—it does not appear that Witness D offered any explanation. According to the AO, Witness D testified that he "informed his soldiers that they could not harass the public" and stated that physical abuse by soldiers "never happened in his barracks." (Doc. # 152-1 at 5.) Additionally, "[w]hen asked specifically how he was promoted through the military ranks without taking part in human rights abuses that were widely reported during his tenure, [Witness D] testified that it was hard work and honesty that helped to propel him." (*Id.*) Based on Witness D's lack of any "explanation" the Court concludes that this factor is at most neutral on the admission of the AO's credibility determination.

At this time the Court will reserve ruling on the government's motion as it relates to Witness D. The admissibility of Witness D's testimony about his asylum proceedings will depend on what questions Mr. Correa poses on cross-examination and what, if any, exceptions to the prohibition on hearsay may apply to the AO's conclusions regarding Witness D's potential involvement in persecution and his credibility. Should Mr. Correa seek to inquire into these topics at trial, the Government may renew its objections.

3.      Witness E's Foreign Criminal Conviction

Another of the Government's witnesses, Witness E—whom Mr. Correa and/or his coconspirators are alleged to have tortured in 2006—disclosed that he had been convicted of failing to keep thorough bookkeeping records in the country where he took refuge after leaving The Gambia. (Doc. # 152 at 19–21.) Criminal histories are not publicly available in the country of conviction, and thus, the Government was not able to secure official documentation of this conviction. (*Id.* at 20.) The Government was able to speak to an attorney involved in the matter who directed the Government to the following statute:

> A person who, intentionally or through negligence, disregards the requirement to maintain accounting records . . . by failing to enter business transactions in the accounts or to preserve accounting records, or by entering false information in the accounts, or in some other way, is, . . . guilty of an accounting offence and is sentenced to imprisonment for at most two years, or, if the offence is minor, to a fine or to imprisonment for at most six months. If the offence is gross, the person is guilty of a gross accounting offence and is sentenced to imprisonment for at least six months and at most six years. When assessing whether the offence is gross, particular consideration is given to whether the disregard of the requirement concerned very considerable amounts, or whether the perpetrator used a false document, or whether the act was part of criminal activities conducted systematically, or whether the act was otherwise of a particularly dangerous nature.

(*Id.* at 21 (citing the statute at issue.)) The attorney further explained that Witness E's conviction was not based on the creation of false records, but rather involved the failure to keep necessary records, and was considered serious on account of the amount in question. (*Id.* at 20.) Witness E did not know the details of the law under which he was convicted but explained that he was sentenced to "approximately four months in jail, followed by periods of home leave and probation, totaling 10 months." (*Id.* at 20.)

The Government concedes that, pursuant to Rule 609, Witness E may be questioned regarding this conviction. (*Id.* at 21.) However, the Government requests that the Court limit Mr. Correa's cross-examination to "the fact and date of such conviction." (*Id.* at 22 (quoting *United States v. Lopez-Medina*, 596 F.3d 716, 737 (10th Cir. 2010).) In support, the Government argues that based on the information it was able to acquire, there is no evidence "from which the court can readily determine" that the crime of which Witness E was convicted "required proving—or the witness's admitting—a dishonest act or false statement." (*Id.* at 20); Fed. R. Evid. 609(a)(2).

The Court reserves ruling on the Government's motion regarding Witness E's criminal conviction. The language of the statute of conviction allows for convictions of both intentional and negligent conduct. Although the attorney involved in Witness E's case told the Government that Witness E's conviction was not based on the creation of false records, this is not necessarily indicative of Witness E's mens rea. If Witness E intentionally failed to keep adequate books, his conviction may fall within Rule 609(a)(2)'s narrow language. However, the Court agrees that in depth cross-examination into Witness E's conviction would likely become distracting.

### 4.   Witness F's Arrest

Another government witness, Witness F—who was also allegedly tortured by members of the conspiracy—was arrested for domestic violence in a foreign country in August 2019. (Doc. # 152 at 23.) The Government argues that Mr. Correa should be precluded from cross-examining Witness F about this arrest because it did not result in a criminal conviction and is not probative for truthfulness. (*Id.*)

As this arrest did not result in a conviction, Rule 609 is inapplicable. The Court agrees that this arrest is not probative of Witness F's character for truthfulness, and Mr. Correa has not provided any evidence or argument otherwise. Additionally, this case does not appear to be one which turns to a large degree on the credibility of the individual victim witnesses. *See* (Doc. # 154 at 4 ("The question of whether the alleged victims accurate recalled every minute detail of their assault will not be at issue.").) Accordingly, the Court concludes that the danger of unfair prejudice substantially outweighs any probative value that testimony related to this arrest may have. The Court will, therefore, preclude cross-examination of Witness F regarding this arrest under Rules 403 and 608(b).

      5.    <u>Witness G's Possible Extramarital Affair</u>

Finally, the Government requests that the Court preclude Mr. Correa from eliciting cross-examination regarding the possible extramarital affair of another of the Government's witnesses, Witness G, who is also alleged to have been tortured by Mr. Correa and/or his coconspirators. (Doc. # 152 at 23–24.) The Government argues that Witness G's extramarital affair is inadmissible under rule 608(b), any probative value is substantially outweighed by the danger of unfair prejudice, or such questioning would subject Witness G to undue embarrassment. (*Id.* (citing Fed. Rs. Evid. 608(b), 403, and 611(a)).)

The Court finds Witness G's potential extramarital affair inadmissible under Rules 402 and 608(b)(1) because it sheds minimal, if any, light on veracity as it relates to Witness G's testimony about the alleged torture at the center of this case. *See, e.g.,*

*Cordova v. Hoisington*, No. 11-cv-806 GBW/ACT, 2014 WL 11842837, at *2 (D.N.M. Jan. 17, 2014) (the proposition that a secret extramarital affair is probative of untruthfulness has been overwhelmingly rejected by numerous courts in numerous contexts). The Court further finds that any marginal probative value is substantially outweighed by a danger of unfair prejudice and wasting time. *See United States v. Giovinco*, No. 18-cr4-14 (JSR), 2020 WL 832920, at *3 (S.D.N.Y. Feb. 20, 2020), *aff'd sub nom. United States v. Esposito*, No. 20-2143-cr, 2021 WL 5492935 (2d Cir. Nov. 23, 2021) ("Evidence of an affair is not particularly probative of a witness's character for truthfulness, and is often unduly prejudicial, justifying exclusion under Rule 403").

Therefore, the Court grants the Government's motion as it relates to Witness G's purported affair.

## B.   MR. CORREA'S MOTIONS IN LIMINE

### 1.   Dr. Akinsulure-Smith

The Government intends to call Dr. Akinsulure-Smith "as an expert in the psychological effects of trauma caused by physical abuse." (Doc. # 160-1 at 2.) Dr. Akinsulure-Smith's testimony is expected to cover (a) the effects of trauma generally, (b) the effects of trauma on memory encoding and retrieval, and (c) other relevant factors related to the impact trauma may have on an individual. (*Id.* at 3–6.)

Mr. Correa does not challenge Dr. Akinsulure-Smith's qualifications as an expert in her claimed field, nor does he challenge whether her proposed testimony is "based on sufficient facts or data," whether it is the "product of reliable principles and methods," or whether Dr. Akinsulure-Smith "reliably applied th[ose] principals and methods." Fed.

R. Evid. 702. Rather, Mr. Correa puts forth two primary reasons why this Court should preclude Dr. Akinsulure-Smith from testifying: (1) her proposed testimony is not relevant to "whether the alleged victims accurately recalled every minute detail of their assault will not be at issue;" and (2) Dr. Akinsulure-Smith's testimony would serve only to impermissibly bolster the victim's testimony. *See generally* (Doc. # 153.) The Court will address each argument in turn.

        *a.*     *Relevance*

Mr. Correa appears to assert that, at trial, he intends to concede that he was involved in the torture of the alleged victims but engaged in such acts under duress and coercion. (Doc. # 153 at 4.) As such, Mr. Correa argues that Dr. Akinsulure-Smith's explanations of why the recollections of witnesses—as survivors of trauma—may be inconsistent, incomplete, or inaccurate, "will not have 'any tendency' to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (*Id.* at 4.)

The Government argues that Dr. Akinsulure-Smith's proposed testimony is relevant and helpful to the jury for several reasons. First, in addition to explaining why the alleged victims' testimony may be inconsistent, incomplete, or inaccurate, Dr. Akinsulure-Smith's testimony will help the trier of fact understand why witnesses may vary in (1) their ability to recount detail, (2) their ability to place their experience in time or in chronological order, and (3) the way they recall their experiences including potentially displaying no or incongruent emotional responses such as laughter. (Doc. # 160 at 4.) In other words, the witnesses may testify in manners which—to a lay

person—may seem inconsistent with their experiences. (*Id.* at 5.) Understanding how trauma impacts memory will, therefore, help the jury evaluate the witnesses' testimony. (*Id.*)

The Government argues that Mr. Correa's purported concessions do not alter this analysis because the Government still holds the burden to prove beyond a reasonable doubt all essential elements necessary to convict Mr. Correa of torture. (*Id.* at 5–6.) The Government notes that (1) Mr. Correa "has not offered any stipulation . . . in which he concedes the elements of the torture charges or stipulates to the [] acts of torture about which the victims and other witnesses will testify" (*id.* at 5–6); and (2) even if Mr. Correa had so stipulated, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." (*Id.* at 6 n.1 (citing *Old Chief v. United States*, 519 U.S. 172, 186–87 (1997); *accord United States v. Martinez*, 92 F.4th 1213, 1243 (10th Cir. 2024).) As a result, the Government's witnesses will testify to their physical abuse and Mr. Correa will likely challenge at least some aspects of that testimony. (*Id.* at 7.)

Finally, the Government argues that Dr. Akinsulure-Smith's testimony is also relevant to Mr. Correa's claimed duress defense including whether "(1) he was under a 'present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself or a family member;' and (2) he 'had no reasonable, legal alternative to violating the law.'" (*Id.* at 6–7 (quoting *Pattern Crim. Jury Instr. 10th Cir.* No. 1.36 (2021).) As it pertains to these elements of a duress defense, the Government asserts that witnesses will testify to, amongst other things,

"observations of Junglers who refused to participate in certain acts of torture or follow certain orders." (*Id.* at 7.) The jury will be required to evaluate this testimony.

Although not explicitly challenged by Mr. Correa, the Court finds that Dr. Akinsulure-Smith is qualified as an expert on the psychological effects of trauma caused by physical abuse based on her extensive education and experience including 30 years of teaching in the areas of trauma and counseling, and "over 24 years of working with survivors of trauma caused by physical abuse." (Doc. # 160-1 at 2.) The Court also finds that Dr. Akinsulure-Smith's proposed testimony regarding common characteristics trauma survivors may display when recounting their experiences is reliable under *Daubert* and *Kumho Tire*. *See* (*id.*); *United States v. Chapman*, 839 F.3d 1232, 1238 (10th Cir. 2016) (concluding an expert's testimony regarding behaviors consistent with domestic violence and sexual assault victimization was reliable despite the expert never having met the victim).

However, the Court reserves ruling on the potential relevance of Dr. Akinsulure-Smith's testimony. The Government's arguments in support of Dr. Akinsulure-Smith's opinions concern the potential need for jurors to evaluate witness testimony that may not align with a layperson's understanding of memory. Yet, prior to observing the testimony of the victim witnesses, it is unknown whether witnesses will testify in a manner that "an untrained layman would not be able to make an intelligent evaluation of . . . without the expert testimony." *United States v. Affleck*, 776 F.2d 1451, 1458 (10th Cir. 1985). Similarly, the extent to which Mr. Correa will challenge the witnesses' testimony, and on what grounds, cannot be known before trial. *See United States v.*

*Parson*, 84 F.4th 930, 938–39 (10th Cir. 2023) (explaining that expert testimony which seeks to explain inconsistencies and memory failures is relevant when a defendant has sought to discredit the victim's testimony); *United States v. Riggs*, No. 23-5062, 2024 WL 2873897, at *10 (10th Cir. 2023) (same). Accordingly, the Government may seek to call Dr. Akinsulure-Smith after the jury has heard the testimony of the trauma survivors. At that time Mr. Correa may renew his arguments and the Court will determine the relevance of Dr. Akinsulure-Smith's proposed testimony.

> b.   *Bolstering or Vouching*

Expert testimony regarding the credibility of another witness is generally impermissible as it invades the jury's "vital and exclusive function to make credibility determinations." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999). Expert testimony that merely serves to bolster or vouch for another witness's truthfulness is not permissible. *United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000). However, the Tenth Circuit has consistently concluded that testimony of an expert who has not met the victim or reviewed their prior statements and which discusses general characteristics of a class of victims does not constitute impermissible vouching. *Charley*, a case involving allegations of child sexual abuse, illustrates the difference between admissible and inadmissible expert testimony of this kind. 189 F.3d at 1264–65, 1270. In *Charley*, the Tenth Circuit concluded that district court did not abuse its discretion by allowing a pediatrician to "inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits." *Id.* at 1264–65. However, testimony by the physician and mental health counselors which assumed the fact of

abuse—in other words, that credited the victims' allegations—was erroneously admitted as the statements were "manifestly outside the counselors' direct knowledge," "unquestionably prejudicial," and "impermissibly invaded the province of the jurors." *Id.* at 1270.

According to the Government, Dr. Akinsulure-Smith has not met any of the likely witnesses or reviewed any of the reports of their interviews and she "will not opine about whether . . . any specific witness is credible, or whether they were tortured." (Doc. # 160 at 10.) Therefore, Dr. Akinsulure-Smith's proposed testimony falls within the category of admissible testimony "addressing a class of victims generally." *United States v. Koruh*, No. 99-2138, 2000 WL 342252, at *2, *4 (10th Cir. Apr. 3, 2000) (*quoting United States v. Bighead*, 128 F.3d 1329, 1331 (9th Cir.1997)); *see also Parson*, 84 F.4th at 939 (noting that the expert's testimony was admissible where she did not opine on victim's credibility or whether a crime had occurred, and further testified that "she never spoke with [the victim], had not reviewed any documents relating to [the victim], and did not know whether [the defendant] molested [the victim]"); *Riggs*, 2024 WL 2873897, at *10 (finding that a psychological expert did not improperly vouch for the victim's credibility where the expert did not know anything about the victim's interviews).

If the Court determines that Dr. Akinsulure-Smith's expert testimony is relevant and helpful to the jury, the Court agrees with the Government that it would not constitute improper bolstering of witness testimony.

2.    Dr. Dwyer

Dr. Dwyer is proposed by the Government as a historical expert witness who will testify on eight topics: (1) a general introduction to The Gambia; (2) The Gambia's independence from Britain up until the 1994 coup; (3) the 1994 coup; (4) politics within The Gambia from 1996 and onwards; (5) President Jammeh and his state security services; (6) Junglers; (7) the 2006 coup attempt; and (8) the end of President Jammeh's regime. *See generally* (Doc. # 159-1.) Dr. Dwyer's report does not include a section describing her methodology. (*Id.*) Mr. Correa does not challenge Dr. Dwyer's qualifications as an expert in African Studies, nor does he challenge the reliability and relevance of six of Dr. Dwyer's proposed topics. (Doc. # 154 at 1–2.) However, Mr. Correa asks the Court to preclude Dr. Dwyer from expounding on topics six and eight.

Again, although not explicitly challenged by Mr. Correa, the Court finds that Dr. Dwyer is qualified as an expert in African Studies due to her education, experience and publication history. *See generally* (Doc. # 159-2.) The Court also finds that Dr. Dwyer's proposed testimony regarding general information about The Gambia, The Gambia's independence from Britain up until the 1994 coup, the 1994 coup, politics within The Gambia from 1996 and onwards, President Jammeh and his state security services, and the 2006 coup attempt is reliable and relevant under *Daubert* and *Kumho Tire*. *See generally* (Doc. # 159-1.); *see also, e.g.*, *United States v. Kantengwa*, 781 F.3d 545, 560–63 (1st Cir. 2015) (affirming the admissibility of testimony by a historical expert).

a.    *Topic Six: Junglers*

Mr. Correa is alleged to have committed the acts charged in the indictment while a member of a unit within the GAF known as "the Junglers." Section six of Dr. Dwyer's report purports to opine on topics such as the formation of the Junglers, their unofficial and secretive role within the security services of The Gambia, their size, their key tasks, and their command structure. (Doc. # 159-1 at 12–14.) Dr. Dwyer also references the Junglers' role in "extra-judicial executions, torture, or other acts of violence," as well as their collaboration with the National Intelligence Agency wherein "the Junglers would brutalize [individuals] to pressure a confession" making these two groups "the most notorious and feared elements of the security services in The Gambia." (*Id.* at 13–14.) In this section of her report Dr. Dwyer cites almost exclusively—sixteen of the twenty-two source footnotes—to the Final Report, Volume 8 of The Gambia's Truth, Reconciliation, and Reparations Commission ("TRRC"). (*Id.* at 12–14.) In section eight of her report, discussed below, Dr. Dwyer explains that the Gambian National Assembly established the TRRC in 2017, to "create an impartial historical record of violations and abuses of human rights" during the Jammeh regime which it did "primarily through public sessions in which victims and perpetrators provided their accounts of incidents." (*Id.* at 19.)

Mr. Correa argues that in this section six of Dr. Dwyer's report, she "ceases to act as a historical expert and rather becomes "conduit for introducing inadmissible hearsay" in violation of Federal Rules of Evidence 702, 703 and *Crawford v. Washington*, 541 U.S. 36, 53–56 (2004), which held that out-of-court statements by

witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses. (Doc. # 154 at 4–5.) The Government counters that Dr. Dwyer "has identified and reviewed relevant source materials and used those as the basis for the proffered testimony," and has "drawn on her own research and experience and on the types of sources usually consulted by historians . . . to understand the information and place it in the proper context." (Doc. # 159 at 9–12.)

The Tenth Circuit has explained that "the extent to which an expert witness may disclose to a jury an otherwise inadmissible out-of-court statement without implicating a defendant's confrontation rights is a question of degree." *Pablo*, 696 F.3d at 1288 (citing *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).

> If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement.

*Id.* An expert whose testimony is "simply a summarizing of out-of-court statements of others" is likely inadmissible. *Cf. Affleck*, 776 F.3d at 1457. On the other hand, experts may recite inadmissible hearsay so long as the statements qualify as information "of the type reasonably relied on by all experts in that particular field," the expert relied upon that information, and "the expert exercised 'independent judgment' in assessing and using the hearsay (and other sources) to reach an expert opinion." Fed. R. Evid. 703; *Kamahele*, 748 F.3d at 1000.

The testimony of historical experts has consistently been admitted where it meets the above requirements. Where admitted, Courts have explained that the historical expert did not merely parrot out-of-court statements, but rather,

- "based his testimony on his accumulation of information from multiple sources, which he then filtered and analyzed based on his [] expertise," *Kamahele*, 748 F.3d at 999;

- "sift[ed] through the many myths and politically charged characterizations . . . to determine what the actual events were," *Kantengwa*, 781 F.3d at 561–62; or

- "gather[ed] multiple sources of information, including original and secondary sources, cross-check[ed] and juxtapose[ed] new information against existing information and evaluat[ed] new information to determine whether his conclusions remain consonant with the most reliable sources." *United States v. Paracha*, No. 03 CR. 1197(SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006).

The Court agrees that the Government has not established that Dr. Dwyer used her expertise as a historian when writing the sixth section of her report. Neither party provided the Court with Volume 8 of the TRRC Final Report, thus, it is not clear what, if any, filtering, analyzing, cross-checking, or evaluating Dr. Dwyer did when it came to writing about the Junglers, or what independent judgment she applied to reviewing the TRRC's writings on this topic. *Cf. Kamahele*, 748 F.3d at 999; *Kantengwa*, 781 F.3d at 561–62; *Paracha*, 2006 WL 12768, at *20. Based on Dr. Dwyer's extensive citations to this one document in section six (which is dissimilar to the remainder of her report), it

appears that Dr. Dwyer merely summarized Volume 8 of the TRRC Final Report. *Cf. Affleck*, 776 F.3d at 1457. This runs afoul of Mr. Correa's constitutionally protected right to confront the witnesses against him and therefore the Court will preclude Dr. Dwyer from testifying about the Junglers.

      b.     *Topic Eight: The end of President Jammeh's Regime*

As it relates to the final proposed topic of Dr. Dwyer's testimony, the end of President Jammeh's Regime, Mr. Correa agrees that Dr. Dwyer "reverts to her proposed role as a historical expert," but challenges the relevance of this topic, pointing out that the events occurred a decade or more after the acts alleged in the indictment. (Doc. # 159 at 2, 7.) According to the Government, this topic is relevant because (1) Mr. Correa—like President Jammeh and other Junglers—left The Gambia after Jammeh's electoral defeat in 2016; and (2) it puts into context the creation, mandate, and work of the TRRC, which formed part of the basis of Dr. Dwyer's opinions. (Doc. # 159 at 12–14.) The Government also notes that it does not intend to elicit all the information contained in section eight of Dr. Dwyer's report. (*Id.* at 14.) In particular, it will not conduct direct examination regarding any opinions by the TRRC as to the allegations stemming from the aftermath of the failed 2006 coup, or the TRRC's recommendations to the government of The Gambia. (*Id.*)

The Court agrees with Mr. Correa that these topics are not relevant to the facts of consequence in this case. When and how President Jammeh and others left the Gambia has no tendency to make it more or less probable that Mr. Correa or his coconspirators conspired to and committed torture ten years earlier. *See* Fed. R. Evid.

401. Similarly, although Dr. Dwyer may testify regarding her sources and the methods she used to reach her opinions, the Court believes she can do this without elaborating as to the context in which the TRRC conducted its work. As such, the Court will preclude testimony on the information contained in section eight of Dr. Dwyer's report pursuant to Rule 402.

## V.    CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

- the Government's first motion *in limine* (Doc. # 152 at 5–9) is GRANTED;

- the Court RESERVES RULING on the Government's second motion *in limine* (Doc. # 152 at 9–19);

- the Court RESERVES RULING on the Government's third motion *in limine* (Doc. # 152 at 19–23);

- the Government's fourth motion *in limine* (Doc. # 152 at 23) is GRANTED;

- the Government's fifth motion *in limine* (Doc. # 152 at 23–24) is GRANTED;

- the Court RESERVES RULING on Defendant Michael Sang Correa's first motion *in limine* (Doc. # 153); and

- Mr. Correa's second motion *in limine* (Doc. # 154) is GRANTED.

DATED: September 10, 2024

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
Senior United States District Judge

29