IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 20-cr-00148-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL SANG CORREA,

      Defendant.

_____

**DEFENDANT'S MOTION FOR VARIANT SENTENCE**
_____

Mr. Correa requests that this Court impose a sentence of imprisonment of 84 months, followed by no additional term of supervised release.  As fully articulated in Mr. Correa's Sentencing Statement filed with this Court on May 30, 2025, (Doc. #233), such a sentence is sufficient, but not greater than necessary, to achieve the sentencing factors set forth in 18 U.S.C. § 3553(a).  Seven years of imprisonment also represents the higher end of the sentencing range recommended by the most appropriate offense conduct guideline, § 2A2.2, Aggravated Assault.

However, in the event this Court adopts the guideline range advocated by the government and probation, then Mr. Correa requests that this Court vary below that guideline range and impose a sentence of 84 months, followed by no term of supervision.

The guideline advocated by both the government and probation is neither appropriate based on the charges in Mr. Correa's Indictment nor does it provide this Court with a sentencing recommendation that roughly approximates the factors set forth in

18 U.S.C. § 3553(a).   As such, a sentence imposed in line with this inappropriate guideline would be both procedurally and substantively unreasonable.

### I.      Personal History and Characteristics and Nature and Circumstances of Mr. Correa's Offense (18 U.S.C. § 3553(a)(1))

In his Sentencing Statement filed in May 2025, Mr. Correa detailed at great length for this Court the mitigating factors in both his personal history and characteristics and the nature and circumstances of his offense.[1]   In short, almost every mitigating factor federal courts consider at sentencings across this country are present here: from Mr. Correa's disadvantageous upbringing as his family struggled with multidimensional poverty, his young age at the time of the offense, his lack of any criminal history in any country either before or after the present offense, the mitigating role he played in the overall conspiracy, and the presence of a genuine and palpable threat of death or serious bodily injury if he had not committed his crimes of conviction.

Despite all of these mitigating factors, many of which probation itself acknowledges in the prefatory paragraph of the "Justification" portion of the Presentence Investigation Report (Doc. #234, p. R-4), both the government and probation persist in their recommendation of an eye-watering 1,440 months of imprisonment.   This draconian request appears to focus singularly on § 3553(a)(2)(A), while completely ignoring all of the remaining sentencing factors that militate against such an unreasonably harsh sentence.

What motivation exists to justify the government's request, which has been echoed by probation?   The answer appears to lie within the government's Sentencing Statement

---

[1] Defendant's Sentencing Statement (Doc. #233)

filed with this Court on May 30, 2025 (Doc. #232): the distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind is an important American national interest.

Generally speaking, that is a true statement. The United States Government does have a keen interest in assuring that persons who violate the Convention Against Torture are held accountable for their crimes. The problem is not with the United States' stated interest; the problem is with the United States government's hypocritical approach for accountability for members of the United States military versus members of a foreign nation's military. The leniency shown to American service members who have tortured detainees in their custody compared to the harshness shown to Mr. Correa, a member of the Gambia Armed Forces, is striking and creates a vastly unwarranted sentencing disparity in violation of 18 U.S.C. § 3553(a)(6).

## II.    The United States Government's Sordid History with Torture and Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6)

In the aftermath of the attacks on the United States on September 11, 2001, the American government, through the Central Intelligence Agency (CIA) and the United States military, orchestrated the systematic abuse of hundreds, if not thousands, of Muslims detained as part of what President George W. Bush swiftly declared a global "War on Terror."[2]  With the participation of at least 54 governments, including The Gambia[3], the CIA and United States military secretly and extrajudicially transferred at least 119 foreign Muslims from one foreign country to another for incommunicado

---

[2] https://www.hrw.org/news/2022/01/09/legacy-dark-side
[3] Former NIA Director Momodou Hydara's testimony before the TRRC on February 4, 2021 (INV_00026122).

detention and harsh interrogation at various black sites – and at least 39 of the men were subjected to "waterboarding," "walling," "rectal feeding" (a form of rape), and other various forms of torture.[4]

The United States military also held thousands of foreign Muslim security detainees, including women and children, at detention centers abroad, including Abu Ghraib in Iraq, Bagram Air Force Base in Afghanistan, and the naval base at Guantanamo Bay in Cuba. Many of these detainees were subjected to physical and psychological abuse. The majority of these detainees were never charged with crimes and never afforded access to lawyers or to the court system. In some instances, detainees died from the abuse. Despite this, very few Americans responsible for these crimes were ever held accountable. And those who were held accountable for the serious human rights violations received sentences that pale in comparison to the 1,440 months requested by the government here.

*A. The Rendition, Detention, and Interrogation Program:*

The CIA, through its Rendition, Detention, and Interrogation Program that was created after 9/11, covertly detained at least 119 Muslim terrorism suspects whom they had captured or abducted in Pakistan, Afghanistan, or other foreign countries.[5] Often aided by foreign security forces, the CIA held or transferred the detainees to undisclosed locations known as "black sites" in an apparent attempt to evade the reach of U.S. and

---

[4] "Committee Study of the Central Intelligence Agency's Detention and Interrogation Program ("Torture Report")," United States Senate Committee on Intelligence, 2014, pp. 2 and 12. *See also* "Globalizing Torture: CIA Secret Detention and Extraordinary Rendition," Open Society Justice Initiative, 2013, https://www.justiceinitiative.org/uploads/655bbd41-082b-4df3-940c-18a3bd9ed956/globalizing-torture-20120205.pdf

[5] "Torture Report," p. 3.

international law.  At least 39 male detainees were tortured by being forced to maintain painful stress positions for hours, submerging their heads in water to the point of near suffocation (waterboarding), denying them sleep for days, "walling" (slamming the detainees' heads into a wall), sensory deprivation, sexual assaults (including rectal feeding, which consists of forcing pureed food into a detainee's anus, a procedure that has no nutritional or medical value), forced nudity, and psychological abuse to include threats of rape and other violence against them and their family members.[6]  These men were held incommunicado in cruel, inhumane, and deeply degrading conditions for years.

From 2002 to 2005, the peak years of the RDI torture program, at least 17 detainees died wholly or partially from the abuse they endured while in the custody of either the CIA or the United States military.[7]  And, of those who survived and are now free, many suffer from conditions such as depression, post-traumatic stress disorder, paranoia, psychosis, permanent headaches, and/or nightmares and other sleep disturbances.[8]

---

[6] "Torture Report," p. 12, and Human Rights Watch, *Getting Away with Torture: The Bush Administration and Mistreatment of Detainees*, July 12, 2011, https://www.hrw.org/report/2011/07/12/getting-away-torture/bush-administration-and-mistreatment-detainees. Physicians for Human Rights has extensively documented medical abuses of detainees, see "*CIA Torture Report Highlights Unnecessary Medical Procedure*," Physicians for Human Rights, December 10, 2014, https://phr.org/news/cia-torture-report-highlights-unnecessary-medical-procedure/.

[7] Eleven detainees died from torture in Iraq and six in Afghanistan, see Steven H. Miles, "Medical Investigations of Homicides of Prisoners of War in Iraq and Afghanistan" *MedGenMed*, 7(3):4, 2005, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1681676/. See also Scott A. Allen, "Deaths of Detainees in the Custody of U.S. Forces in Iraq and Afghanistan from 2002 to 2005," *MedGenMed*, 8(4): 46, 2006, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1868355/#R8.

[8] Matt Apuzzo, Sheri Fink, and James Risen, "How U.S. Torture Left a Legacy of Damaged Minds," *New York Times*, October 8, 2016, https://www.nytimes.com/2016/10/09/world/cia-torture-guantanamo-bay.html.

Despite this and the over 600-page "Torture Report" documenting the systemic abuses that detainees in the CIA or the United States military's custody suffered as a result of the RDI torture program, **the United States Government has not prosecuted a single person responsible for the creation of this program, let alone the lowest level actors merely doing as they were instructed.**

This is contradictory of the government's stated interest in ensuring that America does not become a safe harbor for torturers and that those who commit torture will receive significantly harsh sentences.

B. *Guantanamo Bay, Cuba*

Around the world, Guantanamo Bay remains one of the most enduring symbols of injustice, abuse, and disregard for the rule of law that the United States unleashed in the aftermath of the 9/11 attacks.  Since January of 2002, the United States has held at least 780 foreign Muslim males there.  While there, many of the detainees were subjected to torture euphemistically called "enhanced interrogation techniques" that involved placing them in stress positions for extended periods of time, extended solitary confinement, the threat of death, siccing attack dogs on them, depriving them of sleep, "waterboarding," "walling," and abnormal exposure to extreme heat, cold, and noise for prolonged periods.[9]

The purpose of the torture known as "enhanced interrogation techniques" was to obtain confessions from terrorism suspects.  These confessions, however, proved problematic when detainees were finally granted access to the courts in the United States.

---

[9] Committee on Armed Services in the United States Senate, "*Inquiry into the Treatment of Detainees in U.S. Custody,*" November 20, 2008, https://www.armed-services.senate.gov/imo/media/doc/Detainee-Report-Final_April-22-2009.pdf.

Ultimately, many of these confessions proved useless in a court of law because they were a product of torture.[10]

**Again, the United States government has not prosecuted a single American responsible for the serious human rights violations the detainees suffered at the hands of the United States military and CIA at Guantanamo Bay, Cuba.**

And again, this is contradictory of the government's stated interest in ensuring that the United States does not become a safe harbor for torturers and that those who commit torture will receive significantly harsh sentences.

### C.  Bagram Air Base, Afghanistan

Created in 2002, the Bagram Theater Internment Facility (BTIF) located on Bagram Air Base in Afghanistan was used by both the CIA and the United States military to secretly detain, interrogate, and torture terrorism suspects for up to nine weeks, without access to a court or legal counsel.  The detainees at Bagram were placed in isolation cells, subjected to sensory deprivation, denied sleep, made to stand for prolonged periods of time, chained and shackled, and repeatedly sustained "peroneal strikes" which involved kneeing detainees forcefully in the thigh.  This torture resulted in the death of two of the detainees, Mullah Habibullah and a twenty-two-year-old taxi driver only known as Dilawar.[11]

---

[10] For example, https://www.lawdragon.com/news-features/2025-04-11-sept-11-judge-suppresses-confessions-due-to-cia-torture

[11] https://www.newyorker.com/podcast/in-the-dark/the-war-crimes-that-the-military-buried

On December 3, 2002, Habibullah, who was detained at Bagram, was found unresponsive in his cell hanging limp from arm shackles connected to the ceiling. One week later, Dilawar was found the same way.  Autopsies later determined that both men had died as a result of blunt-force trauma to their legs, and their deaths were ruled homicides.  Army C.I.D. investigators discovered that American service members in the 377th Military Police Company and the 519th Military Intelligence Battalion had subjected both men, and many other detainees at Bagram Air Base, to various forms of torture, to include peroneal strikes to the legs, which proved fatal for both Habibullah and Dilawar. A forensic pathologist would later testify that Dilawar's legs had been essentially "pulpified."[12]

The Army C.I.D. found probable cause to charge twenty-seven American service members with crimes, to include assault, cruelty and maltreatment, and dereliction of duty.[13]  Of those twenty-seven service members, it appears only six were convicted, and only four were actually sentenced to prison.  The longest sentence imposed on the United States service members convicted of torturing Habibullah and Dilawar was **just five months**.[14]

The lenient sentences imposed upon American soldiers who systematically tortured and abused detainees, to the point of death in two instances, in their custody who were suspected of committing crimes against the United States, highlight the government's glaring hypocrisy here.  A 27-year-old African soldier who committed the

---

[12] https://www.latimes.com/archives/la-xpm-2005-mar-23-na-abuse23-story.html

[13] Apparently, the torture was so widespread that no one person could be found accountable for the deaths of the detainees.

[14] https://www.nbcnews.com/id/wbna9520561

same crimes, albeit under far more mitigating circumstances (under the threat of death or serious bodily injury versus doing so for the sake of it), is inexplicably deserving of 120 years in prison versus the five-month sentence imposed on the American solider under similar circumstances.

### D.  Abu Ghraib, Iraq

A prison in Iraq, named Abu Ghraib, became virtually synonymous with torture and cruelty when photos of the abuse became known to the American public in 2004.[15]

 

After public outcry, Army C.I.D. launched an investigation lead by General Taguba.  In his report, General Taguba found that American service members with the 372nd Military Police Company had committed "sadistic, blatant, and wanton criminal abuses."[16]  These abuses, General Taguba found, included:

---

[15] https://www.newyorker.com/magazine/2004/05/10/torture-at-abu-ghraib
[16] Taguba Report - https://irp.fas.org/agency/dod/taguba.pdf

- Punching, slapping, and kicking detainees; jumping on their naked feet;

- Videotaping and photographing naked male and female detainees;

- Forcibly arranging detainees in various sexually explicit positions for photographing

- Forcing detainees to remove their clothing and keeping them naked for several days at a time;

- Forcing naked male detainees to wear women's underwear;

- Forcing groups of male detainees to masturbate themselves while being photographed and videotaped;

- Arranging naked male detainees in a pile and then jumping on them;

- Positioning a naked detainee on a MRE Box, with a sandbag on his head, and attaching wires to his fingers, toes, and penis to simulate electric torture;

- Writing "I am a Rapest" (sic) on the leg of a detainee alleged to have forcibly raped a 15-year old fellow detainee, and then photographing him naked;

- Placing a dog chain or strap around a naked detainee's neck and having a female Soldier pose for a picture;

- A male MP guard having sex with a female detainee;

- Using military working dogs (without muzzles) to intimidate and frighten detainees, and in at least one case biting and severely injuring a detainee; and

- Taking photographs of dead Iraqi detainees.

Ultimately, after two subsequent Army C.I.D. investigations were conducted, probable cause was found to charge twenty-five American soldiers with a variety of crimes, to include sexually humiliaiting detainees, beating and sodomizing them, dragging them around on leashes, and electrocution.[17]  However, in the end, despite multiple Congressional oversight hearings and worldwide condemnation of the United States'

---

[17] https://www.newyorker.com/podcast/in-the-dark/the-war-crimes-that-the-military-buried

policy on torture, only eleven American service members were found guilty at court-

martial.  The most severe punishment meted out to the Amercian service members found

guilty of the serious human rights violations (torture) that occurred at Abu Ghraib was **a

10-year sentence of imprisonment.**  This sentence was reserved for the purported

ringleader of the systemic abuse at Abu Ghraib.[18]  Many of the other convicted soldiers

received far more lenient sentences.

Again, the hypocrisy in suggesting that Mr. Correa receive a sentence of 110 years

in excess of what appears to be the most severe sanction the United States government

has imposed on an American soldier convicted of torturing detainees under the color of

law smacks of a double standard.  The United States Government's position here appears

to be "do as I say, not as I do."  Foreign nationals, including members of a foreign nation's

military, who commit torture will be dealt with severely by the United States government,

but not so much when the perpetrators are American service members.

### E. Conclusion

In the aftermath of the 9/11 attacks, in the name of the "War on Terror," members

of the United States military and the C.I.A. have committed serious human rights

violations, to include systemic torture that, at times, resulted in the death of detainees.

Efforts by the United States government to hold those responsbile accountable have been

sporadic, at best.[19]  Despite the well-documented torture and abuse that resulted from

the C.I.A.'s RDI program and outlined in detail in the United States Senate's "Torture

---

[18] https://web.archive.org/web/20080709005008/http://www.cdi.org/news/law/abu-ghraib-graner.cfm

[19] The United States Government has also refused the International Criminal Court jurisdiction over American service members who have either been accused or actually convicted of violations of the Convention Against Torture.

Report," no prosecutions and no convictions have occurred. And, despite the well-documented atrocities that took place at Guantanamo Bay, again, no prosecutions and no convictions have followed.

There have been, however, some American service members who the United States government has punished for violating the Convention Against Torture – albiet not for that explicitly stated purpose. At Bagram Air Base in Afghanistan, of the twenty-seven service members charged with assault, cruelty, and maltreatment of those detainees, six were ultimately convicted, and four received prison sentences. The lenghtiest sentence was **five months** -  a few months shy of the 1,440 months requested by the United States government here.

Similarly, the United States Army prosecuted twenty-five service members for their role in sexually humiliating, beating, and sodomoizing detainees at Abu Ghraib in Iraq. Of those twenty-five service members, eleven were convicted, and the ring leader was sentence to 120 months (10 years) in prison. While that is a significant improvement over the punishments meted out for Bagram, the ten year prison sentence for the American soldier still falls drastically shy of that sentence the United States government now seeks for the Gambian soldier convicted of the same crimes - by a mere ***1,320 months (or 110 years)***.

Mr. Correa's offenses were serious and should never be condoned, as were the criminal offenses commited by United States service members who tortured and, in some instances, killed detainees in their custody who were accused of committing crimes against the United States. Two wrongs do not make a right. However, when analyzing the 18 U.S.C. § 3553(a) factors, one cannot help but notice the blatant hypocrisy in the

12

United States government's position as to the appropriate sanction for torture committed by a 27-year-old private in Africa versus the appropriate sanction for American service members accused and convicted of the same or even worse conduct.

This hypocrisy is ever more prevalent when one notes the drastic difference in the facts and circumstances of the distinct offenses.  Mr. Correa, on one hand, was under a real and present threat of torture or death himself if he failed to comply with President Jammeh's orders to torture the detainees accused of treason.   The evidence is unequivocal that President Jammeh was a brutal and violent dictator who was either present over the phone to ensure Mr. Correa complied with his demands or, at times, physically present at the NIA.

On the other hand, there is no evidence to indicate that any of the American service members in Iraq, Afghanistan, Cuba, or any of the far flung "black sites" the C.I.A. had in 58 foreign countries, acted under coercion or duress.  Certainly there is no evidence to indicate President Bush was on the phone to ensure these service members tortured the terrorism suspects as directed or was physcially present to ensure compliance.  Instead, the actions of the American service members, at least those convicted of crimes at Bagram Air Base and Abu Ghraib, appeared to be motivated by a desire to humiliate, degrade, and demoralize the detainees under their watch.  Motivation that, in legal circles, would suggest sadistic behavior warranting more serve sanctions than someone who acted under coercion or duress.

Sentencing Mr. Correa to 120 years, or 70 years, or even 20 years in federal prison would create a vastly unwarranted sentencing disparity between American service members with similar records who have been found guilty of similar conduct.  Such a

sentence would run afoul of 18 U.S.C. § 3553(a)(6) and would be both procedurally and

substantively unreasonable.

### III.    Unwarranted Sentencing Similarity with Dissimilar Defendants (18 U.S.C. § 3553(a)(6)

"The Court must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *United States v. Dorvee*, 616 F.3d 174, 187 (2010) and *Gall v. United States*, 552 U.S. 38, 55 (2007).

The United States government and/or probation have pointed this Court, by frame

of reference, to the sentences imposed on Mr. Belfast, Mr. Roggio, Mr. Lowe, and

Mr. Sonko, respectively.  Implicit in this is their view that Mr. Correa should be similarly

sentenced.  However, all of these individuals have been convicted and sentenced for far

more than torture – placing them all in a dissimilar situation than Mr. Correa.

### *United States v. Belfast*[20]

Mr. Belfast, also known as Charles Taylor, Jr., received a 97-year sentence

(23 years less than that advocated by the government here) for committing numerous

acts of torture and other atrocities – to include the summary execution of detainees – in

Liberia between 1999 and 2003.  Mr. Belfast was the son of the president of Liberia,

Charles Taylor, who appointed him as the head of Liberia's Anti-Terrorism Unit (ATU).

The ATU was known locally by a different name, the "Demon Forces."  Under Mr. Belfast's

direction, the "Demon Forces" abducted numerous indviduals, tortured them, and

detained them in grave-sized pits dug in remote settings.  None of these individuals were

accused of committing a crime, and none of them were provided with any legal due

process.

---

[20] 611 F.3d 783 (11th Cir. 2010).

Mr. Belfast, in addition to creating the "Demon Forces" and orchestrating the systematic torture of those they abducted for no cause, also summarily executed three Sierra Leone refugees by having them kneel on the ground and then, one by one, shooting each of them in the back of the head.[21]  These murders are what drove Mr. Belfast's sentencing, as the district court cross-referenced § 2A1.1, the murder guideline.[22]

Mr. Correa, on the other hand, was neither the creator of the Junglers nor was he their leader.  Mr. Correa, in fact, as a private, had no command authority whatsoever. Furthermore, Mr. Correa has not been charged with, let alone convicted of, murdering anyone – especially execution style as described above.  And the victims of Mr. Correa's offense were not randomly abducted for no cause whatsoever.  The victims here were arrested for treason, prosecuted in a court of law for treason, convicted of treason (except for Mr. Dem), and sentenced to prison for treason.

Mr. Correa's conduct is vastly dissimilar to that of Mr. Belfast's.  Mr. Correa's sentence should be nowhere near that of Mr. Belfast's, let alone 23 years longer.  A sentence above, equal to, or anywhere near that imposed on Mr. Belfast here would run afoul of 18 U.S.C. § 3553(a)(6).

### United States v. Roggio[23]

Mr. Roggio was convicted for abducting and torturing an Estonian citizen in the Kurdistan region of Iraq who was threatening to reveal to the United States government his unlawful export of weapons parts from the United States in order to establish a

---

[21] *Id*. at 794.
[22] *Id*. at 801.
[23] 2024 WL 1661117 (M.D. Pennsylvania, April 16, 2024).

clandestine weapons factory.  Mr. Roggio's Superseding Indictment actually alleged that he "abducted" versus "arrested" his employee, and this unlawful abduction led to 39 days of consistent torturing of the Estonian.  For this, Mr. Roggio received a 70-year sentence (almost 50% less than that advocated by the government here).

Again, Mr. Correa's conduct is vastly dissimilar to that of Mr. Roggio's.  Mr. Roggio, like Mr. Belfast, was the head honcho, who organized not only the vast conspiracy to smuggle weapons out of the United States, but also the abduction and systematic torture of his employee who threatened to blow the whistle on him – which is not a crime. Mr. Correa was not in charge, was not accused of vast conspiracy to smuggle weapons parts out of the United States to create a clandestine weapons factory, and, once again, the victims in his case were not kidnapped but were arrested for committing treason.

Mr. Correa's conduct is vastly dissimilar to that of Mr. Roggio's.  Mr. Correa's sentence should be nowhere near that of Mr. Roggio's, let alone 50 years longer.  A sentence above, equal to, or anywhere near that imposed on Mr. Roggio here would run afoul of 18 U.S.C. § 3553(a)(6).

### *Bail Lowe*

According to the documentation provided by probation in the PSR, Mr. Lowe, a member of the Gambian Junglers, like Mr. Correa, was prosecuted in Germany and convicted of two murders and three attempted murders – not for torture.  This is vastly dissimilar conduct that has no bearing whatsoever on the appropriate sentence here.

### *Ousman Sonko*

Mr. Sonko is the former Minster of the Interior under President Jammeh and was considered by many to be his right-hand man.  Mr. Sonko was prosecuted in Switzerland

16

and convicted of multiple murders, along with torture.  And despite also being prosecuted

for multiple sexual offenses as well, without judging that they did not take place, the Swiss

court abandoned these charges for sentencing purposes because they did not constitute

crimes against humanity.  Ultimately, Jammeh's right-hand man, the Minster of the Interior

during the 2006 failed coup attempt and the torture that ensued, Mr. Sonko received a

**20-year sentence of imprisonment** - one hundred years shy of the sentence requested

by the United States government and probation here.

Mr. Sonko held a position of power in Jammeh's administration.  Wielding that

power, Mr. Sonko was found criminally responsible for the murder of three individuals

AND for the torture of those who attempted to overthrow Jammeh's regime in 2006.  For

that, he received two decades in prison.  Mr. Correa, on the other hand, has not been

charged, let alone convicted of murder and held no position of power or trust within the

Jammeh administration.  Accordingly, like the others above, Mr. Sonko's conduct was

dissimilar to that of Mr. Correa's.

Mr. Correa's conduct is vastly dissimilar to that of Mr. Sonko's.  Mr. Correa's

sentence should be nowhere near that of Mr. Sonko's, let alone 100 years longer.  A

sentence above, equal to, or anywhere near that imposed on Mr. Sonko here would run

afoul of 18 U.S.C. § 3553(a)(6).

**IV.    Condign Sentence:**

Seven years in a federal prison in the United States, far removed from his loved

ones in The Gambia, is sufficient, but not greater than necessary, considering <u>all</u> of the

sentencing factors set forth in 18 U.S.C. § 3553(a).  Almost all mitigating factors federal

courts encounter at sentencing are present here.  Yes, Mr. Correa's offense was serious,

17

and justice demands a sentence be imposed – but not a life sentence – and certainly not a sentence that is 100 years greater than that provided to Jammeh's right-hand man, his Minister of the Interior, who, in addition to being found guilty of torturing the victims in this offense, was also convicted of the murder of three individuals.

Not only would sentencing Mr. Correa greater than Mr. Sonko's sentence create an unwarranted sentencing disparity, but it would also send the wrong message of general deterrence to the international community -- high-ranking government officials who coordinate and orchestrate widespread torture and murder will receive far more lenient sentences than the low-ranking members of the military who were forced to carry out their demands under the threat of torture or death themselves.  Such a travesty would do nothing to promote respect for the law.

A sentence of 84 months, followed by no additional supervision, is a condign sentence for Mr. Correa.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


*/s/ Matthew K. Belcher*
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
Email: Matthew_Belcher@fd.org
Attorney for Defendant

18

## CERTIFICATE OF SERVICE

I certify that on August 8, 2025, I electronically filed the foregoing **Defendant's Motion for Variant Sentence** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.


*/s/ Matthew K. Belcher*
MATTHEW K. BELCHER
Assistant Federal Public Defender